**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**L. D. MORRIS, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lawrence Lee JELSMA,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Randall Lloyd KEEF,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jana JARVIS, Defendant-Appellant.**

**Nos. 78–1027 to 78–1030.**

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 25, 1979.

Decided Dec. 26, 1979.

Susie Pritchett, Asst. U. S. Atty., Oklahoma City, Okl. (Larry D. Patton, U. S. Atty. and David A. Poarch, Asst. U. S. Atty., Oklahoma City, Okl., on brief), for plaintiff-appellee.

Raymond Burger, Oklahoma City, Okl. (Gary F. Duckworth of Burger, Wells, Duckworth & Coyle, Oklahoma City, Okl., with him on brief), for defendant-appellant Morris.

Mac Oyler, Oklahoma City, Okl. (Oyler & Smith, Oklahoma City, Okl., on brief), for defendant-appellant Jelsma.

John B. Moorhead, Denver, Colo. (Davis, Moorhead & Ceriani, P. C., Denver, Colo., on brief), for defendant-appellant Keef.

Oscar B. Goodman, Las Vegas, Nev. (Goodman, Oshins, Brown & Singer, Chartered, Las Vegas, Nev., on brief), for defendant-appellant Jarvis.

Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendants-appellants Morris, Jelsma, Keef, and Jarvis have taken these timely appeals from convictions for violation of 18 U.S.C. § 1955, conducting, financing, managing, supervising, directing or owning all or part of an illegal gambling business involving bookmaking and wagering on sporting events, involving five persons or more.[1] Appellants not only challenge the sufficiency of the evidence to support their convictions, but they also contend the trial judge erred when he refused to repoll the jury after the jury foreman changed his verdict when polled as to a fifth codefendant tried jointly with appellants, *inter alia.*

Since the arguments in this case focus largely on a specific subsection of 18 U.S.C. § 1955 we turn first to an examination of the elements of section 1955.[2] The section

---

1. The penalty for violation of 18 U.S.C. § 1955 is a fine of not more than $20,000 or imprisonment for not more than five years, or both. Defendants Morris and Jelsma were fined $10,000 and received sentences of thirty months. Defendants Keef and Jarvis were fined $5,000 and received sentences of fifteen months.

2. Section 1955 provides in pertinent part:

   § 1955. Prohibition of illegal gambling businesses

   (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more

proscribes participation in an "illegal gambling business." That term is defined in subsection (b)(1) as a gambling business which violates state law[3] and, *inter alia*, "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." In order to sustain a conviction under § 1955 there must be proof of the involvement of five or more persons.[4] This requirement lies at the heart of appellants' arguments both on the repolling question and the sufficiency of the evidence.

Keeping the requirement of five or more in mind, a brief procedural history will be helpful. The four appellants were indicted on September 6, 1977, along with four other principals and three alleged aiders and abettors. Two other unindicted persons were named in the indictment charging violation of 18 U.S.C. § 1955 from September 1, 1976, to January 15, 1977. Prior to trial the three persons charged only with aiding and abetting were dismissed, and the two unindicted individuals were granted immunity for their testimony. Another defendant, Howard Ward, was not tried with these appellants for medical reasons. Therefore, when trial commenced on October 18, 1977, seven codefendants were present—the four appellants here as well as Ronald Presley, Gordon Rickard, and Jack Ritter.

On November 1, in the middle of the tenth day of trial, the jury retired to deliberate. On the morning of the fourth day of deliberation, the jury returned two verdicts, acquitting defendants Rickard and Ritter. After a break for lunch, the jury resumed deliberations in the cases of Presley and the four appellants. Verdicts were returned that afternoon under circumstances which will be described in greater detail below. When the jury was finally excused the four appellants had been found guilty and the trial judge had declared a mistrial in Presley's case. We turn to a discussion of the polling issue first.

## I

Each appellant challenges the trial court's denial of counsel's motions to repoll the jury in the unusual circumstances which developed during the returning of the verdicts, claiming that the judge's refusal violated appellants' right to disposition of the charges against them by unanimous verdicts. A careful review of the developments at this point in the trial is of crucial importance, which must be made with the requirement in mind that for conviction the jury had to find that five or more persons were involved in the allegedly illegal gambling business.[5]

When the jury returned to the courtroom following deliberations the foreman announced that the jury had reached a verdict. The deputy clerk read the verdicts, which found the appellants and Ronald Presley guilty as charged. The jurors were then individually polled as to their verdicts

---

than five years, or both.

  (b) As used in this section—
    (1) 'illegal gambling business' means a gambling business which—
      (i) is a violation of the law of a State or political subdivision in which it is conducted;
      (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
      (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

3. The indictment charges that the state law violated was 21 O.S. §§ 982 *et seq.* Appellants do not challenge the sufficiency of the proof of this element.

4. The illegal gambling business also must be "in substantially continuous operation for a pe-

riod in excess of thirty days or [have] a gross revenue of $2,000 in any single day." Appellants do not challenge the sufficiency of the proof of this element.

5. Our question is not whether five or more *defendants* were found guilty by the verdicts in this case, and the Government is correct in asserting that this is not necessary for a finding of guilty under the statute. *See United States v. Quarry*, 576 F.2d 830, 833 (10th Cir.). However, a serious question remains for it *is* required by § 1955 that the jury find that five or more *persons* were involved in the gambling business. And here, as will appear, the circumstances raise a serious question as to that finding and the validity of the verdicts.

on Lawrence Lee Jelsma, Luther David Morris, Randall Lloyd Keef, Jana Sue Jarvis, and Ronald Presley.

When the judge polled the foreman Mr. Mould as to his verdict on Ronald Presley, the foreman responded, "No, your Honor." (XXII R. 1756). The court then asked Mould whether he "want[ed] to go back to the jury room and consider your verdict further." *Id.* Foreman Mould responded affirmatively and the judge directed the jury to retire to the jury room to consider "this last verdict." *Id.*

The defense attorneys then made several motions. Counsel for Presley asked for a mistrial which was denied. Counsel for Morris and Jarvis told the Court "there is some problem with the jury," and requested a mistrial. Counsel for Jelsma joined in, arguing that it was "obvious that that one particular juror [Mould] could hardly express his emotions when he voted guilty." (XXII R. 1757). Counsel for Jelsma then opined further, "He didn't want to vote 'guilty,' it was obvious." *Id.* The judge overruled the motions, and counsel for Jelsma persisted, "There is no way for the record to reflect that man's reluctance to say 'guilty.'" (XXII R. 1758).

Counsel for Morris and Jarvis then moved that "all verdicts be returned to the jury room for the jury to deliberate on all of the defendants." *Id.* This motion was denied, and counsel subsequently argued to the judge that reconsideration of all verdicts was required due to the statutory requirement that the jury find five or more persons involved in the alleged illegal gambling business, 18 U.S.C. § 1955(b)(1)(ii). Counsel for Keef then made his mistrial motion, relying on the previously stated grounds and also focussing on the five person requirement:

> [T]he five defendants who remain in this case would be eliminated to four. In the event that the jury should reach a verdict, I believe that would be sufficient grounds under the circumstances to award a mistrial.

XXII R. 1758. This motion was overruled.

After overruling this last motion, and upon being notified that the jury had completed its deliberations, the court then called for the jurors to be returned to the courtroom. Counsel for Presley immediately objected to this procedure on the ground that it would coerce the jurors. (XXII R. 1759). His motion was overruled and the jury returned. The court asked foreman Mould whether he had had time to reconsider his earlier answer. Mould responded affirmatively, and the court queried, "And is this your verdict?" *Id.* Mould replied, "My verdict is 'no'." The court repeated, "[y]our verdict is 'no.' Then are you saying to the Court that you have a hung jury insofar as Presley is concerned?" Mould responded affirmatively. (*Id.* at 1759).

Immediately after this response, counsel for appellant Jelsma requested the court to poll the jury on all the other defendants. (*Id.* at 1759). The court then said, "No," and proceeded to declare a mistrial as to defendant Presley, thank the jurors for their hard work, and excuse the jury from further duty. (XXII R. 1759–60). As the judge finished his remarks to the jury, but before the jurors left the courtroom (*id.* at 1762), further motions for repolling were made:

Mr. Jackson [counsel for Jelsma]: If the court please   .   .   .

Mr. Williams [counsel for Keef]: Your Honor   .   .   .

Mr. Jackson: May we approach the bench prior to   .   .   .

Mr. Williams: If the court please, I would like, before the jury leaves, to make a motion that the jury be polled as to   .   .   .

Mr. Jackson: Each defendant.

Mr. Williams: As to each defendant.

The Court: I am not going to do it. We have already done that. The jury is excused. The verdicts have been filed and recorded. The jury is excused. We are not going to go over this any more. This is highly improper.

Mr. Williams: Your Honor, *I think it is very, very vital, since five people are*

*required. There is now only four, to understand whether or not other people were considered by them.*

The Court: You are out of order. You are excused, Mr. Juror.

Mr. Mould: Judge, could I ask a question?

The Court: Yes.

Mr. Mould: Well, it would be more in the way of an explanation.

The Court: Well, I don't think it is proper to make an explanation. You have said what you  .   .   .

Mr. Jackson: (Interposing) May it please the Court?

The Court: You mean yourself personally?

Mr. Mould: Well, it has to do with what has been taking us so long and  .   .   .

The Court: (Interposing) I don't think this is any of the Court's business. You have had your deliberations. You have returned into open court your decision, and we can't be vacillating in and out, back and forth, Mr. Mould.

Mr. Mould: *Well, Your Honor, if the—it all hinged—*

The Court: (Interposing) It doesn't make any difference what it hinged on. You've done your deliberations for what is it, three or four days?

Mr. Jackson: May it please the Court, it all hinged on a numerical count. May it please the Court, due to this juror's early reluctance to respond, I think it is highly unfair to put the burden on these other four defendants, if in fact that's part of the consideration.

The Court: Well—

Mr. Mould: Could I explain it to you alone, Your Honor?

The Court: Yes, you can explain it to me in chambers. Come down to the chambers, not here—in chambers, go on down to the chambers. The jury is excused for the term.

(Jurors exit the courtroom.) (XXII R. 1760–62) (Emphasis added).[6]

Counsel for Jelsma argued that without the inclusion of Presley the whole verdict was invalid. The Government asserted that counsel's argument was an incorrect statement of the law, and the court concurred. (XXII R. 1768). A recess followed.

The Government argues that appellants rely on an erroneous legal theory, *i. e.*, that in a prosecution under 18 U.S.C. § 1955 at least five defendants must be found guilty or else all go free. The Government asserts that the law is otherwise, allowing it to try as few as one in a § 1955 prosecution, provided there is proof of the involvement of five or more. *United States v. Quarry*, 576 F.2d 830, 833 (10th Cir.). Further, the Government characterizes the appeal as an attempt to go behind a valid verdict. It agrees that polling is a matter of right and that its purpose is to ascertain unanimity. It says the jurors were polled as to each defendant and there were no uncertainties, that the verdicts were without qualification as to each appellant, that it is impermissible to admit statements or affidavits by members of the jury as evidence of their mental processes in an attempt to overturn a verdict,[7] and that the verdict is final and may not be impeached except by evidence of an improper extrinsic influence.

We start with the proposition that in a federal,[8] criminal case the requirement of unanimity applies not only by reason of

---

**6.** The trial judge later decided not to have a conference with foreman Mould and so advised counsel. (XXII R. 1768).

**7.** In arriving at our conclusion we have not considered the affidavits of the jurors procured by appellants' counsel. *See McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300; *Loney v. United States*, 151 F.2d 1 (10th Cir.); *see* F.R.E., Rule 606(b). Rather we find that the circumstances at trial were sufficient to call for remedial action, as explained below.

**8.** The unanimity requirement has not been constitutionally enforced in state criminal trials before juries of 12 persons. *E. g., Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184. However, unanimity was required where a six member jury verdict on a state nonpetty criminal charge was involved. *See Burch v. Louisiana*, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96.

F.R.Crim.P., Rule 31(a),[9] but also by reason of the Sixth Amendment. *Andres v. United States,* 333 U.S. 740, 748, 68 S.Ct. 880, 92 L.Ed. 1055; *United States v. Gipson,* 553 F.2d 453, 456 (5th Cir.). It is a right so fundamental that it may not be waived. *E. g., United States v. Scalzitti,* 578 F.2d 507 (3d Cir.).

■ Polling is one means of ensuring unanimity. *See United States v. Smith,* 562 F.2d 619, 621 (10th Cir.). It is available on request of any party or on the court's own motion. F.R.Crim.P., Rule 31(d). Where upon a poll one or more jurors express some uncertainty as to the verdict, the trial judge is vested with discretion under F.R.Crim.P., Rule 31(d), to direct the jury to retire for further deliberations or to discharge the jury.[10] *United States v. Smith,* 562 F.2d 619, 621–22 (10th Cir.). Although not expressly so stated in the rule, the power to repoll the jury is also among the judge's discretionary powers. This power is most helpful where, for instance, the jury has been confused by multiple parties or counts. *See e. g., Amos v. United States,* 496 F.2d 1269, 1271–72 (8th Cir.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 140; *Williams and Coleman v. United States,* 136 U.S.App.D.C. 158, 162–163, 419 F.2d 740, 744–45 (D.C.Cir.).

■ In any case upon the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for "[t]here is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." *Cook v. United States,* 379 F.2d

966, 970 (5th Cir.); *Sincox v. United States,* 571 F.2d 876, 878 (5th Cir.); *United States v. McCoy,* 139 U.S.App.D.C. 60, 63, 429 F.2d 739, 742 (D.C.Cir.); *Matthews v. United States,* 252 A.2d 505, 506–07 (D.C.App.). In the *Cook* case, it was held that the trial court erred by refusing to repoll where an uncertainty as to the verdict developed. There the uncertainty appeared due to a notation on the verdict and the jurors' responses to the initial poll, conditioning the verdict to a strong leniency recommendation.

■ Here we must consider whether the circumstances revealed an uncertainty or contingency about the verdicts, calling for some remedial action to insure the protection of the constitutional right of the defendants to valid unanimous verdicts. We must agree that the responses of Foreman Mould created such an uncertainty or contingency about these verdicts. It was apparent that Foreman Mould first voted guilty as to Presley in the jury room and then changed that vote to not guilty by the time of the polling on Presley, as a juror is entitled to do.[11] The polling as to Presley was done last and when Foreman Mould was reached on that defendant, he clearly had decided that Presley was *not* a participant in the gambling business.

■ This signalled an uncertainty or contingency about the foreman's earlier votes, since by that time he may not have remained convinced that there were five participants in the gambling business, as was required for the earlier verdicts to stand.[12]

**9.** Rule 31(a) unmistakably mandates that "[t]he verdict shall be unanimous."

**10.** Rule 31(d) provides:
  (d) Poll of Jury. When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

**11.** Under the Rule as at common law a juror is clearly entitled to change his mind about a verdict he had agreed to in the jury room. *United States v. Shepherd,* 576 F.2d 719, 724 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct.

158, 58 L.Ed.2d 155; *United States v. Sexton,* 456 F.2d 961, 966 (5th Cir.); *Bruce v. Chestnut Farms-Chevy Chase Dairy,* 75 U.S.App.D.C. 192, 193, 126 F.2d 224, 225 (D.C.Cir.).

**12.** As noted above, the jury had earlier returned verdicts of not guilty as to defendants Rickard and Ritter, two of the seven defendants who actually went to trial. While it is true that the Government is not required to establish that five defendants were involved in the gambling business, at this point only eight persons remained from whom the required five might be found to be participants. Besides the four appellants, there were Presley, Ward, Murray and Rodgers, from whom one *had* to be found

At this point there was an uncertainty and contingency as to whether there were valid and unanimous verdicts of the appellants' guilt. *See Amos v. United States*, 496 F.2d 1269, 1271–72 (8th Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 140; *Cook v. United States*, 379 F.2d 966, 970 (5th Cir.); *see United States v. McCoy*, 139 U.S. App.D.C. 60, 63, 429 F.2d 739, 742 (D.C.Cir.). The test for validity of the verdict is whether it ". . . was certain, unqualified and unambiguous considering the circumstances of the receipt of the verdict and poll of the jurors relative to their verdict." *Cook v. United States, supra*, 379 F.2d at 968.

We note one further complicating factor. When the trial court sent the jury back for further deliberation after Foreman Mould's "no" vote on Presley,[13] the jury's deliberations were restricted. The court said "please go back to the jury room to consider the *last verdict*," which was on Presley alone. (XXII R. 1756) (Emphasis added).[14] Counsel for appellants Morris and Jarvis moved that all verdicts be returned to the jury room for the jury to redeliberate on all defendants (*id.* at 1758), as well as moving with counsel for the other appellants for a mistrial in view of the problem. (*Id.* at 1757–58).[15] Since doubts then clouded all the verdicts it was proper to have the jury reconsider all of them. *E. g., United States v. Visuna*, 395 F.Supp. 352, 355 (S.D.Fla.),

*aff'd*, 524 F.2d 1231 (5th Cir.). However, all the motions were denied.

In short, the trial court rejected all remedial measures. The jury was restricted so that it could not reconsider the verdicts as to these appellants when it was sent back to deliberate further, repolling on the verdicts as to these appellants was refused (*id.* at 1759), and mistrials were denied to all of them.[16] Thus there was no safeguard used to protect the constitutional right of these appellants to valid, unanimous verdicts, despite the danger signal.

There is no problem of the trial court being powerless to invoke the remedies of further deliberation or repolling as to these appellants on the ground that the verdicts as to them had been recorded before Foreman Mould's change of his vote. It is true that before the verdicts were read the judge told the clerk to "please read and record the verdicts" and that in his concluding remarks to the jurors he said that the verdicts had been recorded and that he had then polled the jury. (XXII R. 1744, 1760). We do not feel, however, that the record should be read as showing a final recording of the verdicts before the polling under Rule 31(d), F.R.Crim.P., which plainly mandates that "[w]hen a verdict is returned and *before it is recorded the jury shall be polled* at the request of any party or upon the court's own motion." (Emphasis added). For the trial judge conducted the polling

---

to be a participant in the gambling business for any convictions to occur. When the foreman changed his mind about Presley, who might well have been the only other participant in his view, there was a substantial possibility that he no longer would have found five participants to be involved, thus changing his votes on *all* the verdicts.

While the Government's brief on appeal argues that three additional persons (Dixon, Hanson and Malone) also might be noted as participants, the Government at trial did not seriously pursue the point as to these parties, not making any substantial mention of them in its closing argument.

**13.** As noted earlier, the procedure of sending the jury back for further deliberations is specifically authorized by Rule 31(d), F.R.Crim.P., where there is not a unanimous concurrence on the verdict.

**14.** The Government argues that it is significant that when the jury came back to the courtroom after its further deliberations, it did not request a change in the verdicts previously returned. (Brief of Plaintiff-Appellee, 46). The troubling point is that the jury had been specifically limited to reconsideration of the *Presley* verdict alone, and thus the Government's argument is fallacious.

**15.** These motions were timely, being made immediately after the problem arose and without delay as in *Jackson v. United States*, 128 U.S. App.D.C. 214, 216, 386 F.2d 641, 643 (D.C.Cir.).

**16.** As noted earlier, the court did declare a mistrial as to defendant Presley.

*after* the statement to the clerk about reading and recording the verdicts, and the court apparently was not then treating the verdicts as irrevocably filed during the polling; in fact the court considered the change of vote as to the Presley verdict and declared a mistrial as to him.

■ The polling process on the five separate verdicts was conducted in a continuum and that process was still in motion when the polling on Presley reached Foreman Mould. (XXII R. 1744–56). Thus when the "no" statement by the foreman occurred on Presley, creating the uncertainty as to all the verdicts, the trial court still had the authority and duty [17] to take steps to ascertain the validity of the verdicts and to protect the appellants' rights to valid and unanimous verdicts. *See Miranda v. United States*, 255 F.2d 9, 18 (1st Cir.). On the other hand, if the record is read as showing that the verdicts were actually recorded before the polling process occurred, there was a clear denial of appellants' rights as the *Miranda* opinion explains, *supra*, 255 F.2d at 18:

> . . . [I]f we assume that the clerk actually completed the recording of the verdict immediately after the trial judge ordered her to do so it must be concluded that the judge erred in failing to allow the defendant a reasonable opportunity to claim his right [to a poll of the jurors].

We cannot accept the Government's arguments based on the propositions that a valid verdict may not be impeached by jurors' statements after the verdict is recorded and that the sanctity of the jury room should not be violated. Our concerns are not grounded on the post-trial affidavits or on any assertions as to what occurred in the jury room. The events that occurred in court during the polling process, considered in the context of this case, created sufficient uncertainty or contingency about the unanimity of these verdicts to call for protective measures. We likewise must reject the Government's argument that there was no uncertainty expressed during the polling as to the verdicts on these appellants. As explained earlier, by the time the polling process reached the Presley verdict Foreman Mould changed his mind, as he was entitled to do, and that created an uncertainty or contingency as to all the verdicts. See note 13, *supra*.

In sum, this serious problem arose against the back-drop of the five-person requirement with the crucial shift of the foreman's vote. In such a situation where the jurors were still in the courtroom and had not dispersed, *see United States v. Weiner*, 578 F.2d 757, 764 n.2 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651; *cf. Brown v. Gunter*, 562 F.2d 122, 124–25 n.9 (1st Cir.), "the district court had an opportunity to remove the cloud from the verdict," *Cook v. United States, supra*, 379 F.2d at 970. Moreover we note that the trial judge observed in his closing remarks to the jurors that this "is a close case." (XXII R. 1760). In such circumstances we must hold there was prejudicial error by refusing all remedial action to remove the cloud and protect the defendants' rights to valid verdicts.[18]

## II

Although we are remanding for a new trial because of prejudicial error affecting appellants' rights to unanimous verdicts, we

---

**17.** Indeed, Rule 31(d) provides unambiguously that "[i]f upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations *or* may be discharged." Some remedial action is clearly contemplated in such circumstances.

**18.** Since we must reverse on this issue, we need not consider appellants' arguments of prosecutorial misconduct or the refusal to give appellants' requested instructions. In addition, we do not pass on appellant Jarvis's contention that she was denied her right to representation by counsel free from a conflict of interest. Appellant Jarvis was represented by independent counsel in this court, and we are confident that the trial court will accord the defendants their rights in conformity with the requirements of *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426, and the guarantee of the Sixth Amendment to effective assistance of counsel.

We do discuss one matter concerning the instructions later in Part III.

also consider their arguments on the sufficiency of the evidence to support their convictions. We do so since, if the evidence is insufficient, a retrial would violate double jeopardy principles of the Fifth Amendment. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1.

The question when reviewing the convictions on this issue is whether "considering the evidence in the light most favorable to the government, there is substantial evidence from which a jury might reasonably find that an accused is guilty beyond a reasonable doubt." *United States v. Jorgenson*, 451 F.2d 516, 521 (10th Cir.), *cert. denied*, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793; *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. Applying this standard we conclude there was sufficient evidence so that appellants were not entitled to a directed verdict and a retrial is not barred.

Considering the record favorably to the Government as we must on appeal, the evidence tended to show that the Federal Bureau of Investigation (FBI) conducted an investigation of illegal gambling in Oklahoma in late 1976. The investigation involved multiple searches and wiretaps on the telephone of appellants Jelsma and Jarvis and Rhonda Murray, an unindicted party. Tapes of calls intercepted on these lines were played at trial.

The Government also presented detailed evidence about the gambling business through the testimony of FBI agents. Both terminology and specific business techniques such as layoff wagers were described. FBI agent Cross gave his opinion that in this case there were actually six bookmakers, Ron Presley, Jack Ritter, Gordon Rickard, Howard Ward, Marvin Rodgers, and the partnership of L. D. Morris and Johnny Jelsma. (XXI R. 1363). Of this group the jury acquitted Rickard and Ritter and there was a mistrial in Presley's case. On this appeal the Government has not argued that Rickard, Ritter, or Presley were involved in the gambling business.

The appellants admit, and the record demonstrates, that Morris and Jelsma were partners in a gambling operation. The appellants also admit, and the record demonstrates, that the partnership hired Randy Keef, also known as "Bill," to work taking bets and maintaining the records of the operation. (Brief of Appellant Morris, and Brief of Appellant Jarvis at 17). Therefore at least three people participated in the business.

The Government argues further that Marvin Rodgers, an unindicted bookmaker, might also be found to be a participant in the gambling business. It points out that the evidence established that Rodgers was a bookmaker who exchanged line information with the Jelsma-Morris book. He received line information three times a week from them and shared his line with them. (XX R. 910). He had an arrangement with them to share line information and admitted before the jury that he had made "business bets" with the Morris-Jelsma operation through "Bill", Randy Keef. (XX R. 911). He accepted wagers from appellant Keef and settled up on Keef's wagers with Jelsma. (XX R. 912).

The appellants admit that Rodgers was a bookmaker and that he exchanged line information with the Morris-Jelsma operation. They claim, however, that there was no evidence that the line he received from the Morris-Jelsma operation influenced his line or that his line influenced theirs. Appellants also argue that "the fact that he [Rodgers] may have on a few occasions made bets with the Morris-Jelsma operation is not in and of itself sufficient to reach the 'concert of purpose' required in a § 1955 violation." (Brief of Appellant Morris at 55). Similarly, there was no evidence that he was active in the operation of the Morris-Jelsma operation or that he shared any interest in the success of that operation.

Although the fact that Rodgers made bets with the Morris-Jelsma operation may not, without more, be sufficient to show his involvement, there was more evidence. Rodgers himself testified that some of his bets with the partnership were "business" bets. (XX R. 911–12). These were placed either in anticipation of heavy betting on

one side of a game or to help balance Rodgers' books. Thus, the record contains evidence of lay-off betting by Rodgers with the Morris-Jelsma operation. Appellants claim that this is not enough proof; that this alone, without some showing of an interest on behalf of Rodgers in the outcome of the Morris-Jelsma operation, is not sufficient to show that he was a conductor, financer, manager, supervisor, director or owner of the business, citing *United States v. Leon*, 534 F.2d 667 (6th Cir.).

However the present case, unlike *Leon*, does not rely exclusively on tape recordings with exchanges of line information and placing of bets. Instead there was also testimony that here certain bets were business bets as opposed to personal bets. Although the evidence shows that bets placed with Rodgers by "Bill" were personal in nature (XX R. 912), it is not necessary that lay-off betting be a two-way street in order to bring two bookmakers together in an illegal gambling business. *See United States v. Guzek*, 527 F.2d 552, 558 (8th Cir.); *United States v. Plotkin*, 550 F.2d 693, 695 n.1 (1st Cir.), *cert. denied*, 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76. Thus, without being financially interested in the business in the sense of participating directly in its profits, a bookmaker may still place lay-off bets with others which make them conductors of his business as insurers. *United States v. Smaldone*, No. 76–1178 (10th Cir., filed April 7, 1977) (unpublished); *United States v. Votteller*, 544 F.2d 1355, 1359–60 (6th Cir.); *United States v. Schaefer*, 510 F.2d 1307, 1311 & n.6 (8th Cir.), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470; *United States v. Bohn*, 508 F.2d 1145, 1149 (8th Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100; *United States v. McHale*, 495 F.2d 15, 18 (7th Cir.). We therefore feel that there was sufficient evidence to support the inclusion of Rodgers as a participant.

While the Government's brief on appeal does not argue that defendant Presley could be counted as one of the requisite five participants, we should consider all the evidence and it does cover Presley.

The evidence adduced at trial against Presley consisted in part of items seized at his residence. It included, *inter alia*, a newspaper with handwritten notations of teams and points, telephone billing records, schedules for football games with written notations thereon, three sheets of paper containing names of college football teams with plus and minus numbers and a sheet listing Winning Pick Publication in Oklahoma City, miscellaneous sheets of paper with names of teams and numbers, and a publication entitled "Score, America's Number One Rated Football Forecasting Sports Newsletter." In addition, the jury heard tape recordings of eight phone calls on Jelsma's line. Six of the eight calls were identified as calls between Jelsma and Presley.

The testimony concerning Presley revealed that one Choate placed a $1,000 bet with him at Junior's Club in Oklahoma City. Although Mr. Choate won this bet and collected from Presley, he said he expected to pay "juice" if he had lost the bet. Marvin Rodgers also testified concerning his dealings with Presley. He said he accepted bets from Presley on three or four occasions in amounts never exceeding $200.

FBI agent Cross was asked to give his expert description and interpretation of the eight intercepted telephone calls and the physical evidence. He was of the opinion that Presley was a bookmaker accepting wagers on football, college or pro, getting line information from Jelsma, and making lay-off wagers with Jelsma. (XXI R. 1250). The appellants argued at trial that Presley was merely a bettor whose bets were divided into two categories—his personal bets and those which, for lack of a better term, will be called his conduit bets. (XXII R. 1653–67). The record shows that Presley was the manager/bartender at Junior's. He worked for a salary plus tips, and he tried to give good service to his regular customers. (XXI R. 1234). One of these services, it is suggested, was to place bets for his customers. Presley's bets in this personal capacity cannot subject him to criminal liability under federal law. *United States v. Smaldone*, 485 F.2d 1333 (10th

Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286. His bets in a conduit capacity, it was argued, were not sufficient to make him a conductor, financer, manager, supervisor, director or owner of an illegal gambling business. Nor, it was argued, can his activities taken together make him a' participant in the gambling business.

There was testimony that Presley worked for a salary and tips and he had regular customers and tried to render good service for them. (XXI R. 1234). One of the services he performed was the placing of bets. Since this was done regularly through Morris, Jelsma, and Rodgers in the expectation of receiving a higher tip, we are forced to conclude that under *United States v. Bennett*, 563 F.2d 879 (8th Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282, Presley had a sufficient financial interest that a jury might conclude he was a participant in the Morris-Jelsma business. This conclusion is not based exclusively on the Choate transaction. Rather it is founded on the documentary evidence which contains handwritten recordings of some of the bets which Presley placed with Jelsma and Rodgers on the intercepted tapes.

The scope of Presley's operations is also demonstrated by his comment to Jelsma in one of the intercepted calls that he "saves all the big stuff for you [Jelsma]." Exhibit 59, call number 3. The tenor of this and other conversations on the intercepted calls, combined with the physical evidence, indicates the substantial nature of Presley's involvement with Jelsma and Marvin Rodgers. He had an established relationship with the Morris-Jelsma partnership and placed a significant number of bets with it. In this sense then his activities constituted an integral part of the business, for Congress intended "to include all those who participate in the operation of a gambling business, regardless [of] how minor their roles and whether or not they [are] labelled agents, runners, independent contractors or the like, and to exclude only customers of the business." *United States v. Joseph*, 519 F.2d 1068, 1071 (5th Cir.), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312. Thus Presley could be found to be a participant.

■ This brings us to appellant Jarvis. She argues that the evidence was clearly insufficient as to her, not showing that she performed any role in the gambling business or "conducted" it within the meaning of § 1955. The Government argues that its evidence was strong as to her. We agree it was sufficient to sustain conviction of her as an aider and abettor, but not as one committing the substantive offense as a conductor or owner of the business, or the like, under § 1955. Thus we conclude that appellant Jarvis cannot be counted as a participant for the requisite five on this record, but her retrial is not barred for insufficiency of proof at the trial since her conviction as an aider or abettor was sustainable on the record.

The Government points to use of Jarvis's apartment and receipt of phone calls. It is true that there were monitored calls over a three week period which included two calls in which Jarvis informed a caller where Morris could be reached, one in which she took a message for him, and one in which she said she could not go see a friend because "I have to answer his phone." (VI R., tr. of 6th composite tape; Pl. Ex. 57).

■ However, no proof was adduced to show that appellant Jarvis was a partner or an employee of the Morris-Jelsma operation, that she received any dividends, distributions, wages, salary, commission; bonus or tips for her activities, or that she was a bookmaker who made lay-off bets with the Morris-Jelsma operation. Thus she was not shown to be among the "high level bosses [or] street level employees" of the gambling business. *See United States v. Smaldone*, 485 F.2d 1333, 1339 n.3, 1351 (10th Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286. The association with the operation through the calls and the apartment was not substantial evidence of conducting or directing the business, or the like. Mere suspicion of guilt is not enough to sustain a conviction and guilt may not be inferred from mere association. *Davidson v. United States*, 411 F.2d 75, 77 (10th Cir.); *Maestas*

*v. United States*, 311 F.2d 457, 459 (10th Cir.), *cert. denied*, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767.

In sum, we are satisfied that there was sufficient evidence of the elements of the offense—violation of state law, participation by five persons, remaining in substantially continuous operation for over 30 days or with gross revenue of $2,000 in one day—so that appellants were not entitled to a directed verdict or judgment of acquittal. The five could have included Morris, Jelsma, Keef, Rodgers and Presley as participants. And while Jarvis could not be convicted as a conductor, owner or the like and could not be counted as a participant, the evidence was sufficient to sustain her conviction as an aider or abettor [19] so that she also was not entitled to a judgment of acquittal. Thus as to all four appellants there is no bar to a retrial.

### III

#### *Aiding and abetting instruction*

Defendants claim that the trial court erred in giving an aiding and abetting instruction without also instructing the jury that it must first find that the substantive offense was committed before any defendant could be convicted as an aider and abettor. It is argued that in the absence of this additional instruction, the jury could have mistakenly counted an aider and abettor as one of the five persons required under 18 U.S.C. § 1955. We will treat this objection in some detail since it will likely arise at a retrial and does present a substantial question.[20]

The Government concedes that the substantive offense must be established in order to convict anyone of aiding and abetting, but argues that in this case the substantive crime was established and thus the aider and abettor instruction was warranted. The Government misconstrues the appellants' argument about the five-person requirement, interpreting it to say that defendants allege that a principal must be *convicted* before anyone can be convicted as an aider and abettor. The Government asserts that as long as the substantive crime was proved, it is unnecessary to convict anyone as a principal or even to establish the identity of the principal. Further, it says the trial court's instructions on aiding and abetting were appropriate and have been approved. (Brief of Plaintiff-Appellee, 90–97).

The only instruction given by the court on aiding and abetting was the following:

**19.** Appellant Jarvis, along with seven other defendants, was charged with conducting, financing, etc., an alleged gambling business. Three other defendants were specifically charged only with aiding and abetting that offense. At the conclusion of the indictment general allegation was made that the defendants' actions were "[a]ll in violation of Sections 1955 and 2, title 18 United States Code" (II R. 174). As noted, the jury was given a general aiding and abetting instruction.

We discuss below in Part III only the claim of error in connection with the aiding and abetting instruction given.

**20.** The appellants have also made a related argument concerning the aiding and abetting instruction on the basis that it was unnecessary inasmuch as all defendants who had been charged as aiders and abettors had been dismissed prior to trial. (XXII R. 1718 and Brief of Appellant Morris, 67). Although this objection is also raised by the appellants on appeal, we deem it without merit. The law is well-settled that a defendant charged in the indictment only as a principal may be convicted, if the

evidence warrants, as an aider and abettor. *United States v. Vines*, 580 F.2d 850, 853 (5th Cir.), *cert. denied*, 439 U.S. 991, 99 S.Ct. 591, 58 L.Ed.2d 665; *Stewart v. United States*, 311 F.2d 109, 112 (9th Cir.).

A second objection was made in connection with the aider and abettor instruction by defendant Jelsma at XXII R. 1719–20:

Comes now the defendant Jelsma and objects to the Court's instruction regarding the definition of five or more, and we point out to the Court that defendant Jelsma yesterday requested that the jurors be required to nominate by name, should they find five or more, for the reason that *in conjunction with the aiding and abetting instruction, it could very easily give rise to confusion by the jury. The jury might attempt to include one or more of the aiders and abettors* notwithstanding the fact that all have been released from the lawsuit, and notwithstanding the fact that the United States Government specifically did not ask the jury to include those in their findings. (Emphasis added)

Title 18, Section 2 of the United States Code of the laws of the United States provides that anyone who aids, abets, counsels, commands, induces or procures the commission of an offense against the United States, in so doing commits that same offense against the United States. The instruction immediately followed the instruction as to the elements of the substantive offense and immediately preceded definitions of various words used in 18 U.S.C. § 1955.[21]

It is clear that before one can be convicted as an aider and abettor,[22] the jury must first find that the substantive offense has been committed. *United States v. Harper*, 579 F.2d 1235, 1238 (10th Cir.), *cert. denied*, 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427; *United States v. Rodgers*, 419 F.2d 1315, 1317 (10th Cir.); *see Shuttlesworth v. Birmingham*, 373 U.S. 262, 265, 83 S.Ct. 1130, 10 L.Ed.2d 335. Moreover this basic rule should be stated in the charge to the jury. *See United States v. Barker*, 542 F.2d 479, 485–86 n.14 (8th Cir.).

While the aiding and abetting instruction given here was not an incorrect statement of the law, "the court should have given the jury a fuller explanation on aider and abettor and the applicability of the provisions of the statute to the issues in the case. They needed something more than a mere reading of the statute."[23] *United States v. Byrd*, 352 F.2d 570 (2d Cir.). An instruction on aiding and abetting that might be sufficient in the usual case is not always suffi-

cient in every case. *See United States v. Garguilo*, 310 F.2d 249, 254 (2d Cir.). In this case the substantive offense under § 1955 required the participation of at least five persons, and it necessarily follows that an aider and abettor could not be counted as one of the required five persons. *See Morgan v. United States*, 159 F.2d 85, 87 (10th Cir.), *United States v. Doughty*, 460 F.2d 1360, 1363 (7th Cir.). Without an explanation on these involved requirements, the possibility is substantial that a mere aider and abettor might be counted toward the five participants required for the substantive offense to have been committed itself.[24] And the danger of jury confusion was compounded here, where immediately after a recitation of the elements of the substantive crime the court instructed that "anyone who aids . . . the commission of an offense . . . in so doing commits that same offense . . ." (XXII R. 1701).

We conclude it was essential to plainly instruct the jury that the substantive offense must be proved before any defendant may be convicted as an aider and abettor. *See United States v. Barker*, 542 F.2d 479, 485–86 n.14 (8th Cir.). At the retrial, the court should charge that the elements of the substantive offense, including the five person requirement, must be proved before any defendant can be convicted as an aider and abettor and that a person satisfying only the aider and abettor requirements cannot be counted as one of

21. We cannot accept the Government's contention that the trial court explained and defined the requirements of aiding and abetting by its definition of "conduct", "knowingly" and "willfully." (Brief of Plaintiff-Appellee, 94–96). These definitions were obviously defining words in the elements of the substantive offense. (XXII R. 1701–1702).

22. The general rule is that for one to be an aider and abettor it is required that he "associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed." *United States v. Harper*, 579 F.2d 1235, 1238 (10th Cir.), *cert. denied*, 439 U.S. 968, 99 S.Ct. 457, 58 L.Ed.2d 427 (quoting *Roth v. United States*, 339 F.2d 863, 865 (10th Cir.)).

23. The instruction as given was not a verbatim reading of the statute, but a paraphrasing of 18 U.S.C. § 2 which provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

24. Thus, for example, the jury could erroneously conclude that since Jarvis aided Morris in committing the offense she thereby committed the offense as well, and she was one of the requisite five.

the five persons required to establish the substantive offense.

For the reasons stated we are convinced that a new trial must be granted in this cause. Accordingly the judgments are reversed and the cases are remanded for further proceedings in accord with this opinion.