**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Phil PINELLI, David Pinelli, Robert Sheehan, Martin Mosko, Thomas Gottone, William Burbidge, and Aaron Mosko, Defendants-Appellants.**

Nos. 87–2511, 87–2513, 87–2565, 87–2582, 87–2610, 87–2616 and 87–2678.

United States Court of Appeals, Tenth Circuit.

June 9, 1989.

Order on Suggestion for Rehearing En Banc Denied in Nos. 87–2511, 87–2513, 87–2565, 87–2616, 87–2678 Dec. 12, 1989.

Order and Opinion on Rehearing in Nos. 87–2511, 87–2513, 87–2565, 87–2616, 87–2678 Dec. 12, 1989.

---

Joseph Saint–Veltri, Denver, Colo., for defendant-appellant, Phil Pinelli.

Janine Yunker, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, and Frances Smylie Brown, Asst. Federal Public Defender, on the

# 1464

briefs), Denver, Colo., for defendant-appellant David Pinelli.

Richard A. Hostetler, Denver, Colo., for defendant-appellant Robert Sheehan.

Richard J. Banta, Denver, Colo., for defendant-appellant Martin Mosko.

Irving P. Andrews, Denver, Colo., for defendant-appellant Thomas Gottone.

Arthur M. Schwartz, Denver, Colo., for defendant-appellant William Burbidge.

John B. Moorhead (Todd L. Lundy, with him on the brief), Baker & Hostetler, Denver, Colo., for defendant-appellant Aaron Mosko.

Richard J. Marien, Dept. of Justice, Kansas City, Mo. (Michael J. Norton, Acting U.S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee.

Before BALDOCK and
McWILLIAMS, Circuit Judges, and
PHILLIPS *, District Judge.

PHILLIPS, District Judge, sitting by designation.

This gambling prosecution stems from a thirty-five (35) count indictment returned by a federal grand jury sitting in Colorado on February 5, 1986. The indictment charged fourteen defendants, including the seven appellants here, with violating several federal criminal statutes. The pertinent statutes on appeal are 18 U.S.C. § 1955 (operating an illegal gambling business in violation of the laws of Colorado, involving five or more persons, with gross wagers in excess of $2,000 on any single day), 18 U.S.C. § 1952 (interstate use of a telephone to facilitate the gambling business); 26 U.S.C. § 7201 (income tax evasion), 26 U.S.C. § 7262 (failure to pay gambling occupation tax), and 26 U.S.C. § 7203 (failure to file requisite tax forms).

Four defendants entered pleas of guilty prior to trial. Three defendants were acquitted on all charges by the jury. The remaining seven defendants, appellants here, suffered convictions on the counts depicted in the chart below:

| CHARGES AND COUNTS OF CONVICTION | | | | |
|---|---|---|---|---|
| 18 U.S.C. § 1955 | 18 U.S.C. § 1952 | 26 U.S.C. § 7201 | 26 U.S.C. § 7262 | 26 U.S.C. § 7203 [1] |
| Aaron Mosko | | | | |
| Ct. 1 | Cts. 2,3 | Cts. 8,9 | Ct. 10 | |
| Phil Pinelli | | | | |
| Ct. 1 | Cts. 6,7 | Cts. 11,12 | Ct. 13 | |
| David Pinelli | | | | |
| Ct. 1 | | | Ct. 15 | Ct. 14 |
| William Burbidge | | | | |
| Ct. 1 | | | Ct. 18 | Cts. 16,17 |
| Martin Mosko | | | | |
| | | | Ct. 28 | |
| Thomas Gottone | | | | |
| Ct. 1 | | | Ct. 27 | |
| Robert Sheehan | | | | |
| Ct. 1 | | | | |

Appellants have raised numerous issues on appeal. The principal issues involve: (1) challenges to the sufficiency of the evidence by various appellants; (2) constitutional challenges to 18 U.S.C. § 1955 and the applicable Colorado gambling statutes; (3) the trial court's denial of a mistrial motion arising out of the inadvertent submission of non-evidentiary materials to the jury during deliberations; (4) the admission of expert gambling testimony offered by the government; (5) the trial court's denial of appellants' motions to suppress all evidence obtained as a result of a court-authorized wiretap; and (6) the trial court's denial of severance motions made by two defen-

---

* The Honorable LAYN R. PHILLIPS, United States District Judge for the Western District of Oklahoma, sitting by designation.

1. This misdemeanor offense was instructed upon as a lesser included crime of 26 U.S.C. § 7201.

dants at the close of the government's case. We find that there was abundant evidence from which a reasonable jury could find the defendants guilty of the offenses for which they were convicted, and further find no reversible error in the record of this case. Accordingly, we affirm the convictions of all seven appellants.

## I. SUFFICIENCY OF THE EVIDENCE

In a challenge based upon the sufficiency of the evidence, we must affirm the judgment of conviction if there is record evidence which would allow a rational trier-of-fact to find the appellants guilty of the crimes charged in the indictment. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979). Moreover, this Court must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Hooks*, 780 F.2d 1526, 1529–31 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). Viewed in that light, we conclude that the evidence, both direct and circumstantial, satisfies the test.

The government's evidence at trial focused on appellants' gambling activities from September through December, 1984. The evidence consisted of the testimony of thirty-six (36) witnesses, including numerous bettor witnesses, the introduction of several hundred tape recordings of telephone conversations intercepted pursuant to court-authorized electronic surveillance, documentary evidence seized pursuant to search warrants executed on December 9, 1984 after the termination of the wiretap, and expert testimony by an FBI agent on the roles played by the various defendants in the gambling operation.

The electronic surveillance in this case was active for approximately twenty-four days in November and December, 1984. The government's wiretap evidence and seized records in this case indicated the gambling business in question accepted wagers in excess of $2,300,000 in November and December, 1984. [Exs. 608–611].

Special Agent William Holmes of the Federal Bureau of Investigation testified as an expert witness for the government as to the roles of each of the participants in the gambling activity in question. His opinions were based on review of the electronic surveillance and search evidence. [Supp. Vol. 1, p. 36]. He did not rely on and was not privy to the testimony of the bettor witnesses. [*Id.*]. At the outset of his testimony, Holmes explained some basic gambling terminology which will be helpful in explaining the roles of each of the appellants.

Holmes described the "point spread" or "line" as having the purpose of attracting equal amounts of betting on each side of a contest. Bookmakers change the line on a particular game to attract betting on the other team. A line of "Denver minus six" means Denver is favored by six points and to win a bet on Denver, Denver must win by seven or more points. The term "vig" or "vigorish" represents a ten percent commission charged to losing bets, which compensates the bookmaker for the privilege of placing bets. In other words, a $100 losing bet would require payment of $110, which payment includes a $10 "vig". According to Holmes, a bookmaker theoretically strives to accept the same amount of bets on each side of a contest, or balance his books, and take the "vig" as profit.

Agent Holmes explained the concept of "lay-off wagering" as that which allows a bookmaker "to get rid of wagers that he feels he is not financially able to handle and reduce the risk of great financial loss by having to pay off on large sums of money." [Supp. Vol. 1, pp. 16–25]. The following example of lay-off wagering was provided by Holmes during his testimony: Suppose Bookmaker X has wagers of $1,500 on team A and $1,000 on team B. Bookmaker X would lay-off the $500 excess on team A with Bookmaker Y. If team A wins, Bookmaker X would collect $1,000 from those who bet on team B, plus the 10% vig for a total of $1,100. Bookmaker X would collect his $500 lay-off wager from Bookmaker Y, which would make the total amount collected $1,600. From this amount, he would have to pay his bettors who had bet $1,500 on team A. Bookmaker X would thus make a profit of $100 without risking any of his own money. If

Bookmaker X had not laid-off his excess wagers and team A had won, then he would have collected $1,100 from the losers ($1,000 + 10% vig) and had to pay out $1,500 to the winners for a net loss of $400. [Supp. Vol. 1, pp. 16–25]. As will be shown, the concept of lay-off wagering played a central role in the successful prosecution of appellants.

Viewing the evidence in the light most favorable to the government, as we must, a brief summary of the evidence pertaining to each appellant is set forth below: [2]

### A. Aaron Mosko

The evidence in this case demonstrated that defendant Aaron Mosko was in the business of accepting wagers on sporting events. The government's analysis of the evidence used in reconstructing the gambling activity demonstrated that Aaron Mosko accepted over $1,000,000 in wagers in November and December, 1984. [Ex. 609]. The government also introduced evidence, including numerous wiretap conversations, which demonstrated that defendant Aaron Mosko exchanged line information with various defendants and placed lay-off wagers with other bookmakers. The evidence further established that certain defendants placed lay-off wagers with other bookmakers on behalf of Aaron Mosko. [Ex. 384–A, Vol. 14, p. 20; Ex. 172–A, Vol. 9, p. 115; Ex. 180–A, Vol. 9, p. 116; Ex. 616, Vol. 18, p. 12–56; Ex. 617, Vol. 18, p. 12–61; Ex. 368–A, Vol. 14, p. 36; Ex. 609].

Taped conversations between Aaron Mosko and Phil Pinelli were played at trial in which Pinelli gave Mosko the line on numerous games. [Ex. 384–A, Vol. 14, p. 20; Ex. 172–A, Vol. 9, p. 115]. The jury also heard a conversation between Phil Pinelli and Aaron Mosko where Mosko and Pinelli

agreed to line movements on the SMU–Arkansas game. [Ex. 180–A, Vol. 9, p. 116]. The government also introduced a taped conversation between Mosko and Thomas Gottone in which Mosko advised Gottone of the lines on various games. [Ex. 396–A, Vol. 14, p. 23].

Also introduced at trial was a series of taped conversations between Mosko and Robert Sheehan in which Sheehan asked Mosko if he was "alright", to which Mosko responded by asking Sheehan to see what he could "get Miami and Seattle at." [Ex. 368–A, Vol. 14, p. 26]. Sheehan later called back reporting the lines on the Miami and Seattle games to Mosko who then appeared to request Sheehan to place wagers on the two games for him. [Id.]. Additional taped conversations introduced by the government consisted of Aaron Mosko discussing with bettors the mechanics of "laying-off" and alluding to the fact that he made lay-off bets. [Ex. 530–A, Vol. 11, pp. 5–33 to –34; Ex. 616, Vol. 18, p. 12–56; Ex. 617, Vol. 18, p. 12–61].

FBI Agent Holmes, the government's expert, testified that Mosko was in the business of accepting sports wagering activity and that Martin Mosko was at least a "phoneman" for Aaron Mosko who accepted wagers from bettors and relayed them to Aaron Mosko.[3] He described individuals identified as Robert Sheehan and "Denny" as "beards" for Aaron Mosko who placed wagers with other bookmakers on Mosko's behalf.[4] He further described Thomas Gottone as a lay-off source who exchanged wagering activity with Aaron Mosko. He further opined that Aaron Mosko and Phil Pinelli were engaged in a business relationship; that Pinelli advised Mosko as to what to lay-off, and furnished Mosko line

---

**2.** Two appellants, Burbidge and Gottone, do not challenge the sufficiency of the evidence on appeal. Gottone did not file a separate appeal brief. Instead, he filed a motion to join the brief of appellant Phil Pinelli, which was granted on September 22, 1988. Pinelli's brief, however, does not raise a challenge to the sufficiency of the evidence as it pertains to Gottone. Despite their failure to raise the issue on appeal, the evidence regarding these two appellants has

been summarized in order to place their roles in the gambling operation in proper perspective.

**3.** Under the evidence in this case, "phonemen" were individuals who answered the telephone, accepted wagers and disseminated line information on behalf of bookmakers.

**4.** A "beard" is a person who places lay-off wagers with a bookmaker on behalf of another bookmaker.

changes that Pinelli would get from William Burbidge. [Vol. 15, pp. 9-31 to -32].

### B. *Phil Pinelli*

The evidence introduced by the government established that defendant Phil Pinelli was in the business of accepting wagers on sporting events. Specifically, the evidence indicated that Phil Pinelli accepted over $800,000 in wagers during November and December, 1984. [Ex. 608, Vol. 15, p. 9-88].

Evidence consisting of taped conversations between Phil Pinelli and his brother David Pinelli demonstrated a mutuality of risk between the two brothers in their wagering activities, [Ex. 341-A, Vol. 12, p. 114], and indicated the brothers had mutual financial interests. [Ex. 259-A, Vol. 12, p. 88]. Further, wiretapped telephone conversations demonstrated that Phil Pinelli accepted wagers from, and placed wagers with, other bookmakers.

For instance, from taped conversations introduced by the government it was evident that Phil Pinelli accepted wagers from another bookmaker, Aaron Mosko, and placed bets by telephone with Ralph Lackey. [Ex. 192-A, Vol. 10, p. 4-87; Ex. 194, Vol. 10, p. 4-87]. In particular, the government introduced a taped conversation between Aaron Mosko and Phil Pinelli in which Mosko told Pinelli that he "needed" certain amounts on various games. [Ex. 192-A, Vol. 10, p. 4-87]. In another telephone conversation introduced by the government between Pinelli and a person identified as "Doc", Pinelli told Doc that he had "about five or six bookmakers and they unload their, like Aaron and them guys, they load all their shit on me." [Ex. 320-A, Vol. 12, p. 112].

The evidence introduced by the government also indicated that Phil Pinelli kept his gambling records in such a way as to obfuscate their true meaning. For instance, a review of seized records indicates that none of his accounts were identified by recognizable names, but rather by entries such as "K" and "PB". [Ex. 10]. Moreover, the government introduced a taped conversation between Pinelli and Aaron Mosko in which Pinelli explained to Mosko that he kept his books in a certain manner so "if they ever pick up my book, they'll say twenty to twenty, you know, they can't say what they are." [Ex. 345-A, Vol. 12, p. 115]. Phil Pinelli received line information for his gambling activities by placing telephone calls to Las Vegas. [Ex. 154-A; Vol. 9, p. 92; Ex. 278-A].

FBI Agent Holmes testified that in his opinion Phil Pinelli was in the business of accepting sports wagering activity and David Pinelli was his partner and assisted Phil in accepting wagers, setting line, and deciding lay-off policy. [Vol. 15, p. 9-7]. Holmes further opined that Pinelli was engaged in a business relationship with William Burbidge where they shared line information. [Vol. 15, p. 9-24].

### C. *William Burbidge*

The evidence introduced against defendant William Burbidge established that he was in the business of accepting sports wagering activity. This evidence included the testimony of various bettor witnesses who testified that they placed wagers with Burbidge, or placed wagers with Ralph Lackey and later settled the outcome of those wagers with Burbidge. [Vol. 9, pp. 43-46; Vol. 9, pp. 69-72]. Additionally, an FBI handwriting analyst, Joseph Bowers, testified that there was a high probability that documents identified as gambling records seized from the residence of Ralph Lackey contained the handwriting of Burbidge and Lackey. [Vol. 14, pp. 100, 107]. Evidence in the form of wiretap telephone conversations demonstrated that on several occasions Burbidge discussed line information with Phil Pinelli and particularly discussed what points they would use on certain games. [Ex. 318-A, Vol. 12, p. 111]. An additional wiretap conversation had Phil Pinelli placing wagers with Ralph Lackey. [Ex. 103-A, Vol. 9, p. 13].

FBI gambling expert Holmes testified that in his opinion: (1) Burbidge was in the business of accepting sports wagering activity; (2) Lackey was a phoneman who accepted wagers and disseminated line information on behalf of Burbidge; (3) Burbidge and Phil Pinelli had a business relationship where they shared line informa-

tion; (4) Burbidge sometimes acted as a beard for Pinelli; and (5) Burbidge sometimes provided line information for Aaron Mosko. [Vol. 15, pp. 9–24 to –25].

### D. *Thomas Gottone*

The government's evidence against Thomas Gottone included numerous taped conversations between Gottone and Aaron Mosko. In several of these conversations Mosko and Gottone exchanged line information, agreed on the line to be used on certain games, and exchanged wagers. [Ex. 527–A, Vol. 12, p. 82; Ex. 307–A, Vol. 12, p. 109; Ex. 196–A, Vol. 10, p. 4–88]. In one taped conversation Gottone and Mosko went through a number of games with Mosko giving Gottone various amounts. The conversation concluded with Mosko stating, "If you get loaded on Denver by seven thirty or something, call me." Gottone responded "Okay" and Mosko said, "You know, I mean I'm loaded on Denver but that doesn't matter." [Ex. 219–A, Vol. 10, p. 4–113].

Agent Holmes described Tom Gottone as a lay-off source who exchanged wagering activity with Aaron Mosko. [Vol. 15, p. 9–32].

### E. *Robert Sheehan*

The government's theory at trial was that defendant Robert Sheehan was a beard, or lay-off conduit, for Aaron Mosko. The main evidence introduced by the government against Robert Sheehan consisted of taped conversations between Sheehan and Aaron Mosko. These conversations demonstrated that Sheehan was placing bets with third parties on behalf of Aaron Mosko. [Exs. 249–A, 253–A, 254–A, Vol. 12, p. 81; Ex. 339–A, Vol. 12, p. 114]. For instance, in one series of three conversations between Sheehan and Mosko, Sheehan called Mosko and inquired if Mosko was "heavy". Mosko responded that it was too early to have accepted a large amount of wagers. He added that his "bettors all wait until the last minute." Mosko asked Sheehan to call back later. Later Sheehan called Aaron Mosko back and Mosko asked Sheehan to "[g]et me about three thousand on Miami minus fourteen...." Sheehan responded, "Let me

call him right now." A few minutes later Sheehan called Mosko again and informed Mosko that "[y]ou got it." [Ex. 249–A, 253–A, 254–A]. In another taped conversation between the two, Mosko informed Sheehan that all the bets he was receiving on a particular game were on Chicago. The conversation continued:

> Sheehan: Well, if you need to lay anything off, you know.
>
> Mosko: I'll call you if I do.

[Ex. 339–A, Vol. 12, p. 114].

Agent Holmes described Robert Sheehan as a beard for Aaron Mosko who placed wagers with other bookmakers on Mosko's behalf. [Vol. 15, p. 9–32].

### F. *David Pinelli*

The evidence introduced by the government demonstrated that David Pinelli and his brother Phil Pinelli were partners in a gambling partnership.

Tape recorded conversations between the two brothers demonstrated the mutuality of financial interests between the two. [Ex. 230–A, Vol. 11, p. 5–97; Ex. 221, Vol. 10, p. 113]. For instance, in one conversation the Pinellis discussed what they collectively had on Denver and how much they wanted to "lay-off". [Ex. 230–A, Vol. 11, p. 5–97]. In another conversation David and Phil Pinelli went over the day's wagering activity. [Ex. 221–A, Vol. 10, p. 113].

Agent Holmes described David Pinelli as a partner of Phil Pinelli in his gambling business who assisted Phil in accepting wagers, setting line, and deciding lay-off policy. [Vol. 15, p. 9–7].

### G. *Martin Mosko*

The evidence demonstrated that Martin Mosko accepted wagers on behalf of his father Aaron Mosko. [Ex. 338, Vol. 14, p. 24; Ex. 273, Vol. 12, p. 90]. In addition the government offered evidence from which a mutuality of financial interest between Martin Mosko and his father Aaron could be inferred. [Ex. 326–A].

In one taped conversation, Martin and Aaron Mosko discussed what they "needed" on the afternoon games. [*Id.*] In an-

other taped conversation between Martin and Aaron Mosko, Martin reported all wagers he accepted in Aaron's absence. [Ex. 273–A, Vol. 12, p. 90]. Later, in this same conversation Martin stated "I laid off, a, a, a dime with Minnesota plus twelve." [*Id.*].

Agent Holmes described Martin Mosko's role as at least a phoneman who accepted wagers from bettors and relayed them to Aaron Mosko. [Vol. 15, pp. 9–31 to –32].

### H. Conclusions Regarding Sufficiency of the Evidence

Central to appellants' challenge to the sufficiency of the evidence is their claim that the government did not prove the jurisdictional elements of 18 U.S.C. § 1955. Section 1955 makes it a crime to operate an illegal gambling business in violation of the laws of the State of Colorado involving five or more persons which was in substantially continuous operation in excess of thirty days, or which had gross wagers in excess of $2,000 on any single day. Here, the multiple telephone calls on particular days, as well as the coordination among appellants which was evident in many conversations, together with the generated revenues, which were substantially in excess of $2,000 per day, amply provide a basis for the jury's findings.

The remaining charges may be briefly summarized. Title 18 U.S.C. § 1952 prohibits interstate telephone calls which facilitate a gambling business. Title 26 U.S.C. § 7201 declares unlawful all willful attempts to evade the 2% excise tax on wagers accepted. Title 26 U.S.C. § 7203 makes it a misdemeanor for willful failure to file a tax return, while 26 U.S.C. § 7262 is a misdemeanor offense arising out of the failure to pay the gambling occupation tax.

We are convinced that the evidence collectively, both direct and circumstantial, when viewed in the light most favorable to the government, satisfies each of the essential elements of Section 1955 and the other counts of conviction, and demonstrates appellants' participation in a substantial and continuous bookmaking business conducted by multiple bookmakers and others linked through lay-off wagering, exchange and use of line information, and ancillary activities.

### II. CONSTITUTIONALITY OF 18 U.S.C. § 1955 AND RELATED STATUTES

Appellants Phil and David Pinelli, Robert Sheehan, Thomas Gottone, William Burbridge and Aaron Mosko assert 18 U.S.C. § 1955 is unconstitutionally vague. Three of the appellants, Phil Pinelli, David Pinelli and Robert Sheehan, argue 18 U.S.C. § 1955 is unconstitutional as applied to them. Finally, appellants Phil Pinelli, David Pinelli and William Burbridge urge the unconstitutionality of Colorado's gambling statutes, Colo.Rev.Stat. §§ 18–10–101 to 18–10–107, particularly Colo.Rev.Stat. § 18–10–106(1), because they are allegedly vague and overbroad in violation of the first, fifth, and fourteenth amendments and article II, section 10 of the Colorado Constitution. We reject each of these arguments.

This Court has previously upheld the constitutionality of 18 U.S.C. § 1955 on three grounds: (1) that the statute is a valid and constitutional exercise of congressional power under the Commerce Clause of the United States Constitution; (2) it is not repugnant to the Due Process Clause of the fifth amendment; and (3) the statute does not invite double jeopardy. *See United States v. Smaldone,* 485 F.2d 1333, 1342–43 (10th Cir.1973).

▆▆▆ Today, we join five other circuits in ruling that Section 1955 is not void for vagueness. *See United States v. McCoy,* 539 F.2d 1050, 1058 (5th Cir.1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); *United States v. Thomas,* 508 F.2d 1200, 1203 (8th Cir.), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975); *United States v. Mattucci,* 502 F.2d 883, 890 (6th Cir.1974) (by implication); *United States v. Sacco,* 491 F.2d 995, 1003 (9th Cir.1974) (en banc); and *United States v. Riehl,* 460 F.2d 454, 459 (3rd Cir.1972); *see also United States v. Avarello,* 592 F.2d 1339, 1345 (5th Cir. 1979).

Here, appellants argue 18 U.S.C. § 1955 is rendered unconstitutionally vague by the use in the statute of the word "conduct", which is undefined. In addition, the appellants urge that unconstitutional vagueness in Section 1955 is demonstrated by the con-

flicting interpretations given by lower courts to the word "conduct".

■ The void-for-vagueness doctrine requires that a penal statute define a criminal offense with sufficient specificity that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, the Supreme Court has recognized that the most important aspect of the vagueness doctrine "is not the actual notice, but the other principal elements of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974).

Title 18 U.S.C. § 1955 was enacted as Part C of Title VIII of the Organized Crime Control Act of 1970, 84 Stat. 937.[5] The

legislation was aimed toward curtailing syndicated gambling.[6] The statute requires that three elements be established to constitute an offense: there must be a gambling operation which: (1) violates the law of a State or political subdivision in which it is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in a single day. 18 U.S.C. § 1955.

We find that the terminology used in the statute, the discernible legislative intent, and the construction given Section 1955 by other circuits establish minimal enforcement standards and refute the vagueness challenge. The intent of Congress as to the precise meaning of the word "conduct" is neither defined by the statute nor in the history of Section 1955. However, 18 U.S.C. §§ 1955 & 1511[7] were enacted to-

5. 18 U.S.C. § 1955(a) & (b), Prohibition of illegal gambling businesses provides:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

6. *See* 115 Cong.Rec. 10735 (1969) (remarks of Senator Hruska); 116 Cong.Rec. 590–1 (1970) (remarks of Senator McClellan); 116 Cong.Rec. 603 (1970) (remarks of Senator Allott).

7. 18 U.S.C. § 1511 provides in pertinent part: Obstruction of State or local law enforcement

(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—

(1) one or more of such persons does any act to effect the object of such a conspiracy;

(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

gether as sections 802 and 803 of the Organized Crime Control Act of 1970. The same language is used in both statutes to define an "illegal gambling business." Words of a statute which otherwise might be considered unduly vague may be considered sufficiently definite because of their use in other legislation. *Omaechevarria v. Idaho*, 246 U.S. 343, 349, 38 S.Ct. 323, 326, 62 L.Ed. 763 (1918). Sections 1955 and 1511 should be construed together. *United States v. Becker*, 461 F.2d 230, 232 (2nd Cir.1972). When referring to the "illegal gambling business" in Section 1511, Congress stated:

> The section applies generally to persons who participate in the ownership, management, or conduct of an illegal gambling business. The term "conduct" refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet.

1970 U.S.Code Cong. & Admin.News at 4029.

In *Sanabria v. United States*, the Supreme Court noted: "[n]umerous cases have recognized that 18 U.S.C. § 1955 (1976 ed.) proscribes *any* degree of participation in an illegal gambling business, except participation as a mere bettor." 437 U.S. 54, 70–71 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978) (emphasis supplied).

Appellants urge that the unconstitutional vagueness and ambiguity in 18 U.S.C. § 1955 are demonstrated by conflicting interpretations given by lower courts. The Supreme Court has stated:

> [t]he strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.

*United States v. National Prod. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963) (cites omitted). The interpretations placed by various lower courts on the word "conduct" merely demonstrate the difficulty in determining the marginal of-

fenses, not that the statute is void for vagueness. *See, e.g., United States v. Thomas*, 508 F.2d at 1206 ("[I]solated and casual lay off bets and an occasional exchange of line information may not be sufficient to establish that one bookmaker is conducting or financing the business of a second bookmaker."); *United States v. Campion*, 560 F.2d 751, 754 (6th Cir.1977) ("Nothing in the record suggests that Campion's involvement had a significant or substantial impact upon the gambling enterprise."); *United States v. Jenkins*, 649 F.2d 273, 275 (4th Cir.1981) ("[T]he lay-off man need not be present every day.... He must only be available on the critical day when the bookmaker is overbet and needs to reduce his financial risk. One contact is enough for a lay-off man to become a bookmaker....").

Appellants Phil and David Pinelli and Robert Sheehan argue 18 U.S.C. § 1955 is unconstitutional as applied to them. Only Robert Sheehan, however, presents factual arguments based on the record to support this constitutional challenge. He illustrates that he had minimal involvement in this gambling enterprise inasmuch as the only evidence presented relating to him consisted of wiretap conversations, on three different days, in which he discussed four bets with Aaron Mosko. Additionally, he urges the ratio of the dollar value of his bets to the overall dollars wagered and the ratio of the number of his bets to the overall number show his minor role in the operation. Sheehan further argues 18 U.S.C. § 1955 failed to give him fair warning that his conduct would be a violation. We think the statute, and the case law interpreting it, gave appellants adequate warning that their conduct constituted a criminal offense.

Appellants Phil Pinelli, David Pinelli, and William Burbridge assert the Colorado gambling statutes, Colo.Rev.Stat. §§ 18–10–101 to –107, particularly Section 18–10–106(1), are unconstitutionally overbroad in violation of the first, fifth, and fourteenth amendments and article II, section 10 of the Colorado Constitution.

1472

A brief reading of Count I of the Indictment under which appellants were charged shows it alleges violations of four of the Colorado gambling statutes, Colo.Rev.Stat. §§ 18–10–103, –105, –106, & –107. Appellants, however, attack the constitutionality of only Section 18–10–106(1). Portions of the statutes should not be viewed in isolation. *Street v. Lincoln Nat'l Deposit Co.*, 254 U.S. 88, 41 S.Ct. 31, 65 L.Ed. 151 (1920).

When the Colorado Legislature adopted its gambling statutes in 1963, it noted the close relationship between professional gambling and other organized crime, and declared that its policy was "to restrain all persons from seeking profit from gambling activities." Colo.Rev.Stat. § 18–10–101. The Colorado Legislature declared an array of gambling activities illegal: engaging in gambling, Section 18–10–103; possession of gambling devices, Section 18–10–105; maintaining gambling premises, Section 18–10–107. Section 18–10–101(2) declared that the provisions of the gambling statutes were to be liberally construed, administered and enforced with a view to carrying out these declared policies.

■ Appellants urge that Section 18–10–106(1) unconstitutionally infringes upon their first amendment rights of freedom of speech and expression. The overbreadth doctrine prohibits a statute from making criminal otherwise innocent and constitutionally protected conduct. *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). The crucial question then is whether the statute sweeps within its prohibitions conduct that may not be punished because of the protection of the first and fourteenth amendments. *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). Specifically, appellants contend that Section 18–10–106(1), unduly interferes with the first amendment rights of freedom of speech and expression. We disagree.

The Colorado Supreme Court has upheld the constitutionality of certain portions of the Colorado gambling statutes against both vagueness and overbreadth challenges based upon infringement of free expression. *People v. Wheatridge Poker Club*, 194 Colo. 15, 569 P.2d 324 (1977). The Colorado Supreme Court specifically found the statute "conveyed sufficient warning as to proscribed conduct." *Id.* at 328. In addition, the Colorado Supreme Court stated: "[w]e are unable to conclude that any of the activity arguably reached by the statute could be characterized as free expression or involving any right to privacy as that right has been previously defined." *Id.* We believe these holdings of the Colorado Supreme Court to be sound and provide support for upholding the constitutionality of Colo.Rev.Stat. § 18–10–106(1).

It has never been deemed an abridgment of the freedom of speech or expression to make a course of conduct illegal "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 690, 93 L.Ed. 834 (1949).

The Supreme Court has repeatedly expressed its reluctance to strike down a statute on its face where there are many situations to which it might be validly applied. "Thus, even if there are marginal applications in which the statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct ...'." *Parker v. Levy*, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974).

The Supreme Court has also recognized that where conduct and not merely speech is involved, the overbreadth must "not only be real, but substantial as well, judged in relationship to the statutes plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. at 615, 93 S.Ct. at 2917. Here, the Colorado gambling statutes clearly prohibit a whole range of easily identifiable and constitutionally proscribable conduct.

Speech and expression are regulated by the Colorado gambling statutes only to the extent that they involve gambling activities. *See McKenzie v. Municipality of Anchorage*, 631 P.2d 514 (Alaska Ct.App. 1981). We hold that the Colorado gam-

bling statutes, specifically Colo.Rev.Stat. § 18–10–106(1), are neither vague nor overbroad.

## III. MISTRIAL MOTIONS

 Five appellants assert that the trial court committed reversible error by denying a mistrial upon the discovery that a non-evidentiary "post-it" tab had been inadvertently sent to the jury.[8] We disagree.

During the trial, the government utilized a number of reference tabs on exhibits to assist in the preparation and presentation of the case. These colored tabs could be seen by the jury. At the conclusion of the case, the trial court provided the parties an opportunity to inspect all of the evidence to be submitted to the jury. Despite the trial court's stated desire that all exhibits be examined to assure that only items received in evidence be sent to the jury room, and despite at least one defense counsel's assurance that the exhibits had been checked, one yellow "post-it" tab was not removed from Government Exhibit 66. That exhibit, with the yellow tab, was sent to the jury's deliberation room. The notation on the yellow tab read "Phil Pinelli lay-off 11/26/84."

During deliberations, the jury sent a note to the trial court indicating that the tab was folded under the page and asked: "Is the yellow posted part of the evidence?" The district judge, after consultation with counsel, responded as follows:

> The yellow "post-it" tab on Exhibit 66 was not received as a part of the evidence. That tab was mistakenly left on the exhibit when it was received in evidence. It was a note made by government lawyers and refers only to the government's contention. I have removed the tab and you will completely disregard it in considering the evidence in this case.
>
> It would be a violation of your oath to give it any consideration.

[Vol. 24, p. 5].

Based on this unfortunate incident, several defendants moved for a mistrial on a variety of grounds. [*Id.* at 7–9]. The primary grounds were the alleged undue emphasis placed on Exhibit 66 as a result of the tab, and the government's characterization of the document as one which evidenced a "lay-off" bet between Phil Pinelli and William Burbidge. The trial court then denied the mistrial motions, stating:

> Also, it is my view that the jury has shown its conscientiousness in its efforts to consider only the evidence presented in the course of the trial by the very fact that they recognize that that was probably not a part of that exhibit and was probably there inadvertently and it gives me great confidence in the jury to have a note of this type received from them.

[Vol. 14, p. 11].

 Contrary to appellants' assertion that we must reverse if there is even the "slightest possibility of harm" which could result from the jury viewing unadmitted evidence, we instead examine the record to determine if the district court abused its discretion in denying the mistrial motions. *See United States v. Hueftle*, 687 F.2d 1305, 1310 (10th Cir.1982). We also examine the record to determine whether appellants' right to a fair and impartial trial was impaired. *Id.*

In *Hueftle*, a card stating "They're Guilty, Nuke'M" was discovered to have been included with the evidence submitted to the jury. The trial court in *Hueftle*, in addition to giving a cautionary instruction, polled the jury to determine the prejudicial effect of the card on the deliberations, a step not taken here. On appeal, we held that the inclusion of the card in the jury exhibits was not so blatantly prejudicial that the verdict must be overturned. *Hueftle*, 687 F.2d at 1310–11. After reviewing the record, we make similar findings here.

 The extraneous matter in this case was not additional evidence, but rather a "post-it" tab which was inadvertently sent to the jury, and which was merely cumulative of the government's contentions. While the trial court did not poll the jury

---

**8.** The five appellants raising this issue are Phil Pinelli, David Pinelli, Robert Sheehan, Thomas Gottone and William Burbidge.

concerning the prejudicial effect of the incident, no poll was requested by any appellant prior to the return of the verdict.[9] The conscientiousness displayed by the jury and the cautionary instruction given by the trial court convince us that the matter was properly handled, and the alleged error, if any, in failing to poll the jury was harmless. *See United States v. Treadwell*, 760 F.2d 327, 340–41 (D.C.Cir.1985).

## IV. EXPERT GAMBLING TESTIMONY

■ Two appellants, Aaron Mosko and Robert Sheehan, challenge the trial court's admission of expert testimony rendered by FBI Agent Holmes. We review this evidentiary ruling under an abuse of discretion standard. *United States v. Buchanan*, 787 F.2d 477, 483 (10th Cir.1986); *United States v. Fleishman*, 684 F.2d 1329, 1335 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982).

Holmes, after reviewing the intercepted telephone conversations and seized documentation, testified as an expert witness as to his opinion of the roles of each of the participants in the gambling operation. He also provided the jury with an extensive glossary of professional gambling terminology. He did not attempt to offer opinions on the credibility of witnesses who appeared at trial.

The admission of Holmes' testimony is governed by Rules 702 and 704 of the Federal Rules of Evidence.

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 704 provides, in pertinent part:

(a) Except as provided in subdivision (b) [mental state or condition], testimony in the form of an opinion or inference otherwise admissible is not objectionable

because it embraces an ultimate issue to be decided by the trier of fact.

Holmes testified that he was a supervisory special agent assigned to the Gambling Unit of the FBI Laboratory in Washington, D.C. During his nineteen years with the FBI, he has been qualified as an expert witness in gambling cases on more than 200 occasions. His responsibilities include the detection, interpretation and identification of gambling records and gambling paraphernalia. He holds a Bachelor's Degree in Economics and a Master's Degree in Forensic Science, and regularly serves as an instructor to local law enforcement officers in the area of gambling. After a brief recitation of his qualifications at trial, counsel for appellant Aaron Mosko stipulated to Holmes' expertise. [Supp. Vol. Aug. 12, 1987 at 5–10].

Much of Holmes' testimony was admitted without objection. The only pertinent objections occurred when Holmes began to provide his opinions on the roles played by the various defendants in the gambling operation. [Vol. 15, pp. 9–6, –67, –74, –82]. Given the complexity of the case, the volume of tape recordings and documentary exhibits, as well as the average person's unfamiliarity with the professional gambling business, it was well within the discretion of the trial judge to permit such testimony on the theory that Holmes' specialized knowledge would assist the trier-of-fact in understanding the evidence. Fed.R.Evid. 702. Moreover, the testimony of Holmes did not offend Rule 704, which allows opinion testimony embracing an ultimate issue. Fed.R.Evid. 704.

Aside from the fact that the plain language of Rule 704 is the short and complete answer to most of appellants' objections, we note that other courts have permitted law enforcement witnesses to provide both lay and expert opinions concerning the roles played by participants in a variety of illegal activities, including gambling operations. *See, e.g., United States v. Fleishman*, 684 F.2d at 1335, and cases

---

9. Following receipt of the verdicts, however, the trial court denied a defense request to interview the jurors.

cited therein; and *United States v. Masson,* 582 F.2d 961, 964 (5th Cir.1978). Under the circumstances of this case, we find that the district court did not abuse its discretion in admitting the testimony of Holmes.

## V. ADMISSION OF WIRETAP EVIDENCE

■ All appellants, with the exception of Martin Mosko, challenge the admissibility of evidence obtained as a result of court-authorized electronic surveillance on two grounds. First, appellants assert that the trial court erred in refusing to suppress the contents of the wire interceptions based on the government's failure to comply with 18 U.S.C. § 2518(1)(e). Second, appellants argue that the four-day delay between the termination of the wiretap and the sealing of the original tapes required suppression. Neither ground has merit.

Each application for court-authorized interception of wire communications requires the following information:

a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the applications, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

18 U.S.C. § 2518(1)(e).

It is undisputed that appellant Phil Pinelli had been previously named as an interceptee in a state wiretap affidavit at the time the application to intercept wire communication was submitted to the district court. The Colorado state wiretap affidavit, in turn, led to the initiation of a federal criminal prosecution, *United States v. McNulty,* 729 F.2d 1243 (10th Cir.1983).[10] It is also undisputed that the government in this case failed to list Phil Pinelli as a prior interceptee pursuant to Section 2518(1)(e) when it applied to the federal

district court for authorization to intercept wire communications in the instant case.

Based on these allegations and others, the district court held a pretrial evidentiary hearing on appellants' motions to suppress. Robert Mydans was the government attorney who signed the affidavit requesting the court-authorized wiretap. He testified that had he known of Phil Pinelli's status in the state wiretap case, he would have listed Phil Pinelli as a prior interceptee in the affidavit he submitted to the district court.

From a review of the record in this case, it is clear that the government's failure to list Phil Pinelli as a prior interceptee was unintentional, and that none of the suppressed *McNulty* wiretap evidence was included in the application or affidavit submitted by the government in this case. As conceded by counsel for Phil Pinelli at oral argument, had the government listed Phil Pinelli as a prior interceptee, inclusion of that information would have served to *support* the government's application for an interception order in this case. *United States v. Mosko,* 654 F.Supp. 402, 408 (D.Colo.1987). In short, the failure to comply with Section 2518(1)(e) under the circumstances of this case does not require suppression. *See United States v. Donovan,* 429 U.S. 413, 425 n. 14, 97 S.Ct. 658, 667 n. 14, 50 L.Ed.2d 652 (1977); *United States v. Abramson,* 553 F.2d 1164, 1169 (8th Cir.1977).

■ Similarly, the district court fully considered the four-day delay between the termination of the wiretap and the sealing of the original tapes. The district court found that the government amply explained the reasons for the delay at the evidentiary hearing held prior to trial and further found that suppression was unwarranted. These findings are not clearly erroneous. *United States v. Diana,* 605 F.2d 1307, 1314 (4th Cir.1979) (thirty-nine (39) day sealing delay did not require suppression), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

10. In *McNulty,* the wiretap evidence was suppressed in the federal prosecution because the wiretap order issued by a Colorado state district judge failed to comply with Colorado wiretapping law. 729 F.2d at 1266–69.

We note that the district court held a lengthy evidentiary hearing on the admissibility of the wiretap evidence and heard arguments on the multiple challenges to this evidence advanced by appellants. The district court subsequently issued a detailed opinion denying the various suppression motions. *United States v. Mosko,* 654 F.Supp. 402. We affirm the district court's denial of the suppression motions for substantially the same reasons set forth in the district court's well-reasoned opinion.

## VI. MID–TRIAL SEVERANCE MOTIONS

■ At the conclusion of the government's case, counsel for appellant Phil Pinelli made a series of requests. He sought a severance of the two tax evasion counts (Counts 11 and 12) from the remaining counts, or alternatively, a court-imposed restriction on the scope of cross examination if Phil Pinelli chose to testify as to the tax evasion counts. He also made a related request to waive jury trial on the two tax evasion counts. [Vol. 19, pp. 13–17]. The requests were grounded on Phil Pinelli's assertion that he desired to testify regarding the tax evasion counts, but retain his fifth amendment privilege with respect to the gambling charges. His brother, David Pinelli, who also faced two tax charges (Counts 14 and 15), made the same request with respect to Count 14 only. [Vol. 19, p. 19]. The government declined the defendants' offers to waive jury,[11] and the district court denied the defendants' requests. We find that the requests were neither timely nor meritorious.

The decision on whether to grant a severance lies within the sound discretion of the trial court and its decision will not be reversed on appeal in the absence of a strong showing of prejudice. *United States v. Hayes,* 861 F.2d 1225, 1231 (10th Cir.1988); *United States v. Heath,* 580 F.2d 1011, 1022 (10th Cir.1978), *cert. denied sub nom.,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979).

The defendants' burden to show an abuse of discretion is a difficult one. *United States v. Van Scoy,* 482 F.2d 347, 349 (10th Cir.1973). Here, both defendants requested *for the first time* at the conclusion of the government's case-in-chief a severance of counts and a proposed waiver of jury. Furthermore, none of the pretrial motions filed by the defendants suggested any fifth amendment concerns associated with the joint trial of the gambling charges and the tax counts. Given the fact that the tax and gambling charges in this case were inextricably intertwined, even a timely motion for severance would have posed a formidable obstacle for the defendants in this case. Here, however, the severance motions were not timely made and therefore were appropriately denied. *United States v. Sanders,* 463 F.2d 1086, 1089 (8th Cir. 1972).

## VII. REMAINING GROUNDS

The remaining grounds for reversal have been carefully examined and none is meritorious. They are (1) allegedly prejudicial verdict forms; (2) post-trial denial of a defense motion to interview jurors; (3) failure to grant a defense motion for a bill of particulars; (4) allegedly improper jury instructions; and (5) failure of the trial court to grant a defense motion for a new trial on the grounds of cumulative prejudice.

JUDGMENT AFFIRMED.

Before HOLLOWAY, Chief Judge, McWILLIAMS, McKAY, LOGAN, SEYMOUR, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, Circuit Judges, and PHILLIPS **, District Judge.

## ORDER

The appeals in the captioned cases were disposed of by the court's opinion filed on June 9, 1989. The court now has for consideration appellants' petitions for rehearing in 87–2511, U.S.A. v. Phil Pinelli and 87–2513, U.S.A. v. David Pinelli. The court

---

**11.** [Vol. 19 at 17]. Rule 23(a) of the Federal Rules of Criminal Procedure provides:

Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government.

** The Honorable Layn R. Phillips, United States District Judge for the Western District of Oklahoma, sitting by designation.

also has for consideration appellants' petitions for rehearing, with suggestions for rehearing en banc, in 87–2565, U.S.A. v. Robert Sheehan, 87–2616, U.S.A. v. William Burbidge, and 87–2678, U.S.A. v. Aaron Mosko.

Upon consideration whereof, the panel judges who filed the opinion sought to be reheard grant rehearing for the limited purpose of discussing issues raised in the petitions for rehearing. A separate opinion on rehearing is filed coincident with the filing of this order.

In accordance with Rule 35, Federal Rules of Appellate Procedure, the petitions for rehearing en banc were transmitted to all judges of the court who are in regular active service. No member of the panel and no judge in regular active service on the court having requested that the court be polled on rehearing en banc, Rule 35, Federal Rules of Appellate Procedure, the suggestions for rehearing en banc are denied.

Circuit Judge JOHN P. MOORE did not participate.

Before BALDOCK, McWILLIAMS, and PHILLIPS, District Judge.

## ON PETITION FOR REHEARING

PHILLIPS, District Judge.

In our last disposition of this case, we affirmed the convictions below of all seven defendant-appellants. From this affirmance, five of the appellants seek rehearing and/or rehearing *en banc* concerning various aspects of the panel opinion. We grant rehearing to discuss the issues raised. For the reasons set forth below, we reaffirm these convictions.

## I.

These appellants, Phil Pinelli, Robert Sheehan, and Aaron Mosko, seek rehearing and/or rehearing *en banc* concerning the constitutionality of 18 U.S.C. § 1955. In their initial appeals, appellants argued 18 U.S.A. § 1955 was void for vagueness by the use of the word "conduct" in the statute which was undefined. Appellants further asserted the unconstitutional vagueness in Section 1955 was demonstrated by the conflicting interpretations given to the word "conduct" by various lower courts. Our panel opinion rejected these arguments and upheld the constitutionality of the statute.

Appellants now argue the panel opinion conflicts with prior circuit precedent in *United States v. Morris*, 612 F.2d 483 (10th Cir.1979) and *United States v. Boss*, 671 F.2d 396 (10th Cir.1982). On rehearing, appellants urge the panel's construction of 18 U.S.C. § 1955 based on *Sanabria v. United States*, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978), creates criminal liability for any degree of participation in an illegal gambling business, except simple betting. Therefore, appellants argue the "any participation" standard of the panel opinion is inconsistent with, or overrules by implication, the "necessary" versus "helpful" distinction drawn by our circuit in *Morris* and *Boss*. We cannot subscribe to this reasoning.

Our previous opinion examined the terminology, discernible legislative intent, and construction given to Section 1955 by other circuits deciding the issue of *vagueness*. This examination was conducted to determine whether Section 1955 defined the offense of conducting an illegal gambling business with sufficient specificity that ordinary persons could understand what activities are prohibited. In this regard, we held that the offense was sufficiently defined to give minimal guidance to law enforcement officials. Further, we held the statute was not vague.

We remain unpersuaded that conflicting lower court decisions demonstrate vagueness. It would not have been "possible or practical for Congress to outline" all of the possible ways a person "might be said to conduct a gambling business." *United States v. McCoy*, 539 F.2d 1050, 1058 n. 8 (5th Cir.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). Moreover, the contours of federal jurisdiction under Section 1955 have not yet been fully delineated. *McCoy*, 539 F.2d at 1058. Contrary to appellants' suggestion, our previous opinion is squarely in line with the teachings of the Supreme Court that stat-

utes are not automatically vague "simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. National Dairy Prod. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963) (citations omitted).

Our circuit's decisions since 1973 illustrate our efforts to develop these "contours" of Section 1955. In *United States v. Smaldone*, 485 F.2d 1333 (10th Cir.1973), *cert. dismissed*, 416 U.S. 917, 94 S.Ct. 1625, 40 L.Ed.2d 119, *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974), we recognized Congress' intent to incorporate within Section 1955's prohibition all participants except those who actually wagered. *Smaldone*, 485 F.2d at 1351. Then in 1979, in *Morris*, we found that a person who allowed principals in a bookmaking operation to use her apartment and who received telephone messages for the principals was not a conductor of the business, since her actions were merely helpful to the operation of the enterprise. *Morris*, 612 F.2d at 494. Finally, in 1982 in *Boss*, we refined the contours still further. We held a waitress who served drinks to dance hall customers, who were gambling in an illegal dice room at the hall, did not fall within the scope of Section 1955's prohibition against one who "conducts" a gambling operation. *Boss*, 671 F.2d at 402. The *Boss* court held that Section 1955 contemplates participants in an illegal gambling operation performing duties "necessary" to the operation of the gambling business. *Id.* at 400. The waitresses who did nothing more than serve drinks to gamblers were not "necessary" to the business within the meaning of the Act.

Today, we reaffirm that the statute is sufficiently explicit to afford fair warning to bookmakers contemplating conducting business transactions with other bookmakers as in this case. Additionally, we reaffirm the statute is explicit enough to provide minimal guidance to law enforcement. In reaching these decisions, we do not question, upset, reverse, reject or overrule this circuit's precedent in *Boss* and *Morris*.

Appellant Sheehan reasserts his argument that 18 U.S.C. § 1955 is unconstitutional as applied to him. Sheehan complains that the Court failed to explain why we were unpersuaded by his contentions regarding the small number of bets and their dollar value, and their ratio to the overall number of bets and dollar value. The evidence against Sheehan is amply described in our previous opinion. We reaffirm that Sheehan's activities constituted an "integral part of the business." *Morris*, 612 F.2d at 494. We further find that the *Morris* and *Boss* cases gave Sheehan adequate warning his conduct constituted a criminal offense.

Finally, appellant David Pinelli argues a review of the sufficiency of the evidence presented against him demonstrates that the language of Section 1955 was not adequate to give him notice that his actions constituted conducting an illegal gambling business involving five or more persons. We have again reviewed the evidence against David Pinelli. We affirm that the evidence demonstrated David Pinelli's joint interest in the partnership with his brother, Phil, where lay-off wagering and line exchange routinely and regularly occurred among the appellants. Clearly, the statute and our prior decision in *Boss* gave David Pinelli the notice he claims was lacking. *Boss* held where there is sufficient connection between distinct bookmaking operations, they are viewed as one gambling business under § 1955, because all the operations involved some actual gambling function necessary to the illegal operation. *Boss*, 671 F.2d at 399.

II.

Two of the appellants, David Pinelli and Robert Sheehan, request rehearing and/or rehearing *en banc* urging the insufficiency of the evidence to convict them under 18 U.S.C. § 1955. They argue the evidence must be measured against the standards enunciated by this Court in *United States v. Morris*, 612 F.2d 483 (10th Cir.1979), and *United States v. Boss*, 671 F.2d 396 (10th Cir.1982).

Appellant David Pinelli acknowledges that the panel opinion summarized the evidence presented against him at trial. Opinion at 1468. He claims the evidence presented below showed only that Pinelli

was a partner with his brother, Phil Pinelli, in a gambling partnership. David Pinelli asserts, however, that the evidence failed to show he was involved in any gambling business conducted by the other co-defendants. Therefore, he argues the panel erred in finding evidence sufficient to convict him of a violation of 18 U.S.C. § 1955.

Robert Sheehan also seeks rehearing contending the evidence presented was insufficient to support his conviction for being a conductor of the illegal gambling business alleged in Count One of the Indictment. Sheehan repeats the three arguments he raised to the panel in support of these contentions. First, Sheehan urges, the evidence was not sufficient to establish a linkage between the individual gambling offices necessary to establish the five conductors for Section 1955 liability. Second, Sheehan explains the evidence was insufficient to link Sheehan to appellant Mosko's office because there was no showing the bets discussed between Sheehan and Mosko were "lay-offs" as defined by case law. Finally, Sheehan stresses the evidence was insufficient to show he performed a "necessary" function in Mosko's operation as required in *Morris* and *Boss*. Sheehan's rehearing brief at 1–3.

The panel opinion summarized the evidence presented against appellants David Pinelli and Robert Sheehan. Opinion at 1468. Clearly, the taped conversations between Sheehan and Mosko demonstrated Sheehan was placing bets with third persons on behalf of Aaron Mosko, and show Sheehan personally used the phrase "lay anything off" in such discussions. Agent Holmes described Sheehan as a "beard" for Mosko who placed wagers with other bookmakers on Mosko's behalf. The evidence against David Pinelli amply demonstrated his joint interest in the partnership with his brother, Phil, wherein lay-off wagering and line exchange routinely and regularly occurred among the appellants.

The jury was instructed concerning the "necessary" nature of the function played by each individual, [Vol. 23, p. 13], the necessity of a "showing of sufficient connection between gambling operations so

that they are viewed as one operation," [Vol. 23, pp. 13–14], and the definitions of lay-off bets [Vol. 23, p. 14].

■ The panel has again examined the evidence, both direct and circumstantial, in the light most favorable to the government, as required, and finds "there is substantial evidence from which a jury might reasonably find" the appellants guilty beyond a reasonable doubt. *Morris*, 612 F.2d at 492 (citing *United States v. Jorgenson*, 451 F.2d 516, 521 (10th Cir.1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972)). The Court finds the activities of David Pinelli and Robert Sheehan constituted an "integral part" of this illegal gambling business. *Morris*, 612 F.2d at 494. In addition, without being financially interested in the business, "a bookmaker may still place lay-off bets with others which make them conductors of his business as insurers." *Morris*, 612 F.2d at 493. Finally, here, we find "sufficient connections between the gambling operations so that they are viewed as one gambling business under § 1955, all the operations involving, however, some actual gambling function necessary to the illegal operation." *Boss*, 671 F.2d at 399.

Accordingly, the panel reaffirms its finding of sufficient evidence.

### III.

■ Appellant Aaron Mosko claims the trial court improperly instructed the jury. Mosko seizes on the use of the word "aiding" in an instruction concerning Colorado's statutory prohibition of professional gambling and argues it may have allowed the jury to convict him upon a diluted standard of liability. In support of this proposition Mosko relies on *United States v. Morris*, 612 F.2d 483 (10th Cir.1979). A full analysis of the *Morris* case shows that it has no application to this jury instruction controversy.

In *Morris*, seven persons were tried for operating an illegal gambling business in violation of 18 U.S.C. § 1955. Defendant Jarvis was also charged with aiding and abetting the commission of a federal offense under 18 U.S.C. § 2. During the

trial, the government produced evidence to show Jarvis allowed certain co-defendants to use her apartment, took telephone messages for one defendant and informed a caller where Morris could be reached. At the end of the trial, the jury convicted Jarvis of violating both Section 1955 and Section 2.

On appeal, our circuit upheld Jarvis' conviction as an aider and abettor but found the evidence was not sufficient to sustain her conviction as a conductor or owner of an illegal gambling business under Section 1955. *Morris*, 612 F.2d at 494–95. The *Morris* panel thus distinguished conduct amounting to participation in the operation or direction of a gambling business in violation of Section 1955 from aiding and abetting.

The *Morris* court then discussed the specific instructions given by the trial court including the sequence of instructions. The trial judge had given an aiding and abetting instruction immediately following the instruction as to the elements of the substantive offense under Section 1955 and immediately preceding the definitions of certain words used in 18 U.S.C. § 1955. *Morris*, 612 F.2d at 496. It was determined that a substantive offense under Section 1955 required the participation of at least five persons, and "it necessarily follows that an aider and abettor could not be counted as one of the required five persons." *Id.* at 496 (citing *Morgan v. United States*, 159 F.2d 85, 87 (10th Cir. 1947); *United States v. Doughty*, 460 F.2d 1360, 1363 (7th Cir.1972)).

The *Morris* court concluded that upon retrial, in order to avoid confusion, the jury should be instructed that the "substantive offense, including the five person requirement, must be proved before any defendant can be convicted as an aider and abettor and that a person satisfying only the aider and abettor requirements cannot be counted as one of the five persons required to establish the substantive offense." *Id.* at 496–97.

Using this case as a springboard, Mosko takes issue with the following instruction given by the trial judge in the instant case:

Count I of the indictment charging the Defendants with violating 18 United States Code Section 1955, when I read to you a few moments ago, alleges that the gambling business in question was illegal, as in violation of the various sections of the Colorado Revised Statute.

The Colorado Statute referred to in the indictment prohibits professional gambling. Bookmaking is professional gambling. The Statute also makes it illegal to knowingly transmit or receive any information intended to be used for aiding another to engage in professional gambling with the intent to derive a profit therefrom.

[Vol. 23, pp. 11–12].

Mosko suggests this instruction violates *Morris* for three reasons. First, the proximity of the "aiding" instruction to the Section 1955 instruction allegedly resulted in a defendant being counted in the jurisdictional five even though only an "aider." Second, the instructions purportedly allowed a defendant to be counted as a participant in the gambling business prior to a determination of whether the conduct of the defendant met the standards of liability under Section 1955. Finally, the instruction allegedly equated a Section 1955 violation with a violation of the state professional gambling statute defined as "aiding." Mosko's rehearing brief at 3. Mosko asserts these three deficiencies could result in a defendant being found guilty if he only "aided" others. Additionally, Mosko urges that if any of the defendants that the jury considered mere aiders were counted with Mosko, the jurisdictional five may have been reached in violation of *Morris*. Mosko's rehearing reply brief at 3.

The government responds that this case is distinguishable from *Morris* because the aiding and abetting statute, 18 U.S.C. § 2, by title or substance, was neither charged nor referred to at any time by any party during this trial. The government argues no theory of liability of any appellant as an aider or abettor was argued or inferred by the Government. The government urges that contrary to Mosko's assertion, the jury was clearly charged that the business had

to be in violation of state law, that each defendant had to knowingly participate in the business, and that they could convict only on evidence that met the standard of principal under Section 1955.

We have reviewed all of the instructions given by the trial court, both individually and as a whole. We believe that the focus of the sentence in the challenged instruction in which the word "aiding" occurred was the *type* of activity which was illegal under the Colorado professional gambling statute. The trial judge instructed the jury that the Colorado gambling statutes made unlawful the acts of anyone who "knowingly transmit[ted] or received any information intended to be used for aiding another to engage in professional gambling...." [Vol. 23, p. 12]. The reason for including an instruction concerning illegal activity under the Colorado statutes was that a violation of state law was one of the elements to be found for a violation of Section 1955. However, the use of the word "aiding" was not in isolation. The trial court instructed more fully concerning the conduct that was necessary to convict under Section 1955:

> The term "conduct" as it is used in connection with an alleged illegal gambling business means to perform any act, function or duty which is necessary to the ordinary operation of the illegal gambling business....
>
> ....
>
> ... You are instructed that activity, which may be merely helpful to an illegal gambling business, does not make a person a conductor of the illegal gambling business. Thus, only persons with some function necessary to the illegal gambling business may be considered by you in determining whether there are five or more persons conducting the illegal gambling business
>
> ....

[Vol. 23, pp. 12–13].

The trial court further charged:

> The word "necessary" is to be distinguished from the word helpful. Neces-

sary means essential. While helpful means of some assistance....

[Vol. 23, p. 13].

We have reviewed the instructions, as a whole, as required, and determined the instructions adequately apprised the jury of the applicable law, *United States v. Pepe*, 501 F.2d 1142, 1149 (10th Cir.1974), and as a whole gave an accurate statement of the law. *United States v. Rothbart*, 723 F.2d 752, 754 (10th Cir.1983) (citing *United States v. Hudler*, 605 F.2d 488, 490 (10th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980)).

Here, contrary to Mosko's assertion, the jury was not charged on an aiding and abetting theory. The reason for the lack of the charge was that no defendant was indicted, charged, nor tried as an aider and abettor. Further, the jury was not given the discretion to convict a defendant who only "aided." It is clear from the instructions that here the jury was not subjected to the type of confusion which occurred in *Morris*. The jury was clearly apprised of the standard of culpability needed to convict such individual defendant as a principal. They were expressly charged that evidence of conduct that merely assisted was not sufficient to convict. We thus conclude that the potential for the jury to convict Mosko on a diluted standard of liability was non-existent. Further, the potential for others to have been convicted with Mosko who were merely "aiders" was also non-existent.

## IV.

On rehearing, appellant William Burbidge requests reversal of his conviction and remand of the case for a new trial. Burbidge argues the panel opinion applied an incorrect standard in reviewing whether the jury's exposure to extrinsic material in the jury room requires a new trial. The panel opinion applied an abuse of discretion standard to the trial court's ruling on Burbidge's motion for mistrial and request for new trial. Burbidge argues the applicable legal standard in the Tenth Circuit is whether "there is the slightest possibility that harm could have resulted from the

jury's viewing of unadmitted evidence" in which case "reversal is mandatory." *United States v. Marx*, 485 F.2d 1179, 1184 (10th Cir.1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974). Burbidge states the Tenth Circuit recently reaffirmed the standard in *Johnston v. Makowski*, 823 F.2d 387, 390 (10th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988). Burbidge seeks rehearing in order for the proper standard of review to be applied.

The two cases from our circuit relied upon by Burbidge both involve identified but unadmitted exhibits which were mistakenly given to the jurors to take to the jury room. In *Marx*, a consent-to-search form and $1,000 in currency were offered into evidence by the government but not admitted by the trial judge in appellant's bank robbery trial. *Marx*, 485 F.2d at 1184. Applying the "slightest possibility of harm" standard, our circuit found that the unadmitted evidence viewed by the jury did not constitute prejudicial error. *Id.*

In *Johnston*, a police report which defense counsel had used during cross-examination, and which had been marked for identification only, but not received in evidence, found its way into the jury room. Applying the "slightest possibility of harm" standard, our circuit found that appellant's rights were not violated by the presence of the police report in the jury room during deliberations. *Johnston*, 823 F.2d at 389–91.

Unlike *Marx* and *Johnston*, the present case does not involve exhibits which were offered but not received in evidence. Instead, the extraneous matter was a yellow "post-it" tab attached to an exhibit, which exhibit had been properly received into evidence.

We have again reviewed all the evidence presented against appellant Burbidge, the contents of the "post-it" tab, and the nature of the inquiry from the jury as follows:

Exhibit 66, this is a yellow tablet with a yellow posted piece of paper attached to a page. The yellow posted note says, P. Pinelli, layoff, 11–26–84, and was folded under a page. Is the yellow posted part of the evidence? Jerry Pearson. [Vol. 24, pp. 3–4].

In addition, we have again reviewed the district court's consultation with counsel and the district court's subsequent response to the jury's question:

Members of the jury, the yellow "posted" tab on Exhibit 66 was not received as a part of the evidence. That tab was mistakenly left on the exhibit when it was received in evidence. It was a note made by government lawyers and refers only to the government's contention. I have removed the tab and you will completely disregard it in considering the evidence in this case.

. . . .

... It would be a violation of your oath to give it any consideration. [Vol. 24, pp. 4–6].

Finally, we have again reviewed the argument of Burbidge's counsel in support of his request for mistrial and the district court's reasons for denying mistrial. We also reviewed Burbidge's belated motion to interview the jurors filed a week after the completion of the trial, and motion for new trial, together with the district court's denials.

We believe this situation is much more analogous to *United States v. Hueftle*, 687 F.2d 1305 (10th Cir.1982), relied upon previously by the panel. In *Hueftle*, when the jury retired to deliberate concerning charges of trespass at a nuclear plant site, the jury discovered a card reading "They're Guilty, Nuke'M" among the evidence. They sent a note to the trial judge indicating those jurors who had viewed the card had voted they could ignore it. *Hueftle*, 687 F.2d at 1308. The trial court, in *Hueftle*, in addition to giving a cautionary instruction, polled the jury concerning their ability to ignore the card and render fair and impartial verdicts, a step not taken here. On appeal, we held that the inclusion of the card in the jury exhibits was not so blatantly prejudicial that the verdict must be overturned. *Hueftle*, 687 F.2d at 1310–11. We also held that the trial court did not abuse its discretion in denying a mistrial motion. *Id.* at 1311.

Like *Hueftle*, the extraneous matter involved in this case is a note. Also, like *Hueftle*, the jury specifically requested direction of the trial judge and received a cautionary instruction. Finally, like *Hueftle*, the panel applied the "abuse of discretion" standard.

The Court reaffirms its previous decision that the extraneous matter in this case was merely cumulative of the government's contention, about which the jury was clearly on notice. Moreover, the "post-it" contention was duplicative of evidence already presented against Burbidge. Specifically, the "layoff" term used on the "post-it" was contained in Exhibits 608, 609, 610 and 611, to which Burbidge made no objection. These exhibits contained summaries of total wages accepted and "layoffs" associated with appellants Phil Pinelli, Aaron Mosko, David Pinelli, and William Burbidge. This evidence, the jury's obvious attempt to clarify exactly how or whether they were to consider the "post-it," together with the trial court's cautionary instruction, and the overwhelming evidence of appellant's guilt, convince us the trial court did not abuse its discretion in denying the appellant's motion for mistrial and request for new trial. *United States v. Hueftle*, 687 F.2d at 1311.

We hold, however, as our Circuit did in *Johnston*, that under any standard, appellant Burbidge's claim fails. *Johnston*, 823 F.2d at 390.

## V.

Finally, two appellants, Aaron Mosko and Robert Sheehan, take issue with the panel's finding "the district court did not abuse its discretion in admitting the testimony of [FBI Agent] Holmes." Opinion at 1475. The Court has again reviewed this ruling and determined the objections as nonmeritorious.

Our previous judgment is modified to reflect our supplemental opinion on rehearing. The judgments of convictions are AFFIRMED.