T.C. Memo. 2007-109


UNITED STATES TAX COURT


PATRICIA B. PATERSON, ET AL.[1] Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  8093-04, 8094-04,     Filed April 30, 2007.
          22397-04.


<u>Thomas Edward Brever</u>, for petitioners.

<u>David W. Sorenson</u> and <u>Lisa R. Woods</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income taxes and fraud penalties under

_____

[1]This case is consolidated for briefing, trial and opinion
with the cases of George M. Paterson, Docket No. 8094-04, and
George M. Paterson, Docket No. 22397-04.  Mr. and Mrs. Paterson
are referred to collectively as petitioners.

section 6663 for 1997 and 1998 (the years at issue).[2]

Respondent determined that petitioner Patricia B. Paterson (Mrs. Paterson) was liable for a $53,168 deficiency and a $39,876 fraud penalty for 1997.  For 1998, respondent determined that Mrs. Paterson was liable for a $16,402 deficiency and a $12,301.50 fraud penalty.

Respondent determined that petitioner George M. Paterson (Mr. Paterson) was liable for a $125,280 deficiency and a $93,960 fraud penalty for 1997.  For 1998, respondent determined that Mr. Paterson was liable for a $88,257 deficiency and a $66,192.75 fraud penalty.

There are three issues for decision.  The first issue is whether petitioners understated their income in the amounts respondent determined for the years at issue.  We hold that they did.  The second issue is whether petitioners are liable for the fraud penalties for the years at issue.  We hold that they are. The third issue is whether the limitations period bars respondent from assessing petitioners' taxes for the years at issue.  We hold that it does not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are

_____

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

incorporated by this reference. Petitioners resided in Eden Prairie, Minnesota, at the time they filed the petitions.

Petitioners are married and were married during the years at issue. Petitioners filed the tax returns for the years at issue as married filing separately.

## Mr. Paterson's Bookmaking Activities

Mr. Paterson stipulated that he has been a professional bookmaker for about 20 years including the years at issue. Mr. Paterson has a criminal history. He was convicted of tax evasion in 1979. He also recently pleaded guilty to another criminal fraud charge relating to Form 730, Tax on Wagering, that he filed for years other than the years at issue. Mr. Paterson expected at the time of trial that he might have to serve time for these criminal offenses.

Mr. Paterson conducted his illegal activities with two sons from a previous marriage. The three of them took bets at one son's apartment in Eden Prairie, Minnesota. The primary assets of the bookmaking enterprise were three cellular phones. Mr. Paterson had no credit history because he dealt solely in cash and had no credit card, so Mrs. Paterson obtained them in her name. Mr. Paterson's customers called these phones to place bets.

Mr. Paterson had between 50 and 75 regular customers who bet with him. These customers bet on college and professional football and usually called Mr. Paterson to bet on Saturdays and Sundays, the highest volume days. Mr. Paterson charged his

customers a 10-percent commission, called vigorish, on bets that his customers lost.[3]

Mr. Paterson did not accept bets on other sports, except a few on World Series games. He occupied himself during the football off-season by gambling on golf and cards. He won as much as $2,000 at a time on golf and card games but did not report any of these winnings on his tax returns.

Mr. Paterson tried to avoid being caught at his illegal activities. He accepted mainly cash from his customers and used code numbers to identify his customers in case his bookmaking business was ever raided. In addition, he destroyed his records of who each customer was and how much each customer bet weekly. He instead kept a tally of profit in his head.

Mr. Paterson attempted to comply with laws regarding registration of bookmakers with the Internal Revenue Service (IRS) because he feared that he and his sons would be jailed for failure to register. He purchased a "gambling stamp," Form 11C, Occupational Tax and Registration Return for Wagering, for 1997 and 1998. Mr. Paterson also filed monthly Forms 730 with the IRS for all of 1997 and January through October of 1998. The Forms 730 indicate that Mr. Paterson reported a total of gross wagers of $196,500 for 1997 and $210,400 for 1998.

---

[3]Vigorish has been described as a means to compensate the bookmaker for the privilege of placing bets. See United States v. Pinelli, 890 F.2d 1461, 1465 (10th Cir. 1989). If a bookmaker is balanced, meaning he or she has an even number of bets on both sides of the contest, the vigorish will be profit to the bookmaker. See id.

Despite Mr. Paterson's efforts to avoid being caught at his illegal activities, agents of the Minnesota Gambling Enforcement Division searched Mr. Paterson's home and his son's apartment on December 12, 1999. The agents arrested Mr. Paterson and seized gambling records covering 4 days of betting and three cellular phones. The gambling records seized indicate that Mr. Paterson accepted an average of $96,070.50 of bets each day for those 4 days, a vastly larger amount than the gross wagers Mr. Paterson reported on the Forms 730. In fact, the total gross wagers accepted over those 4 days exceeded the total wagers Mr. Paterson reported he accepted for the entire year 1997 or the entire year 1998. Moreover, the seized records did not include a Saturday, which is generally a high-volume day, and included one partial day of wagering because the search commenced before the day's wagering was complete.

Mrs. Paterson's Activities

Mrs. Paterson was aware of her husband's illegal gambling activities. She has worked as a flight attendant for Northwest Airlines (NWA) for approximately 25 years, but she worked only limited hours during the years at issue. In fact, NWA reported it paid her only $3,105 in 1997 and $16 in 1998.

Mrs. Paterson helped her husband hide his bookmaking activities although she did not accept bets herself. She obtained the cellular phones in her name that were seized in the

December 1999 search.[4]  Mrs. Paterson herself never used these telephones.

Mrs. Paterson also assisted her husband in concealing assets to help hide his bookmaking activity.  Petitioners' joint bank accounts had only minimal activity during the years at issue. Mrs. Paterson kept separate bank accounts and brokerage accounts, however, solely in her own name.  She made numerous deposits of large sums totaling thousands of dollars into these accounts during the years at issue.  Many of these deposits were of cash or checks made payable to her husband.

Mrs. Paterson also kept significant assets in her own name rather than having assets titled in both petitioners' names or having assets titled only in Mr. Paterson's name.  For example, the home in which she and Mr. Paterson have resided for the past 20 years is solely in Mrs. Paterson's name, and she is the only person listed on the mortgage.  She also paid approximately $34,000 cash in 1997 to buy a Cadillac for her husband to use, paying with a check drawn on her checking account.  The vehicle purchase contract was in Mrs. Paterson's name.

---

[4]The Court finds petitioners' testimony that Mrs. Paterson obtained the cellular phones for a computer business they were trying to start inconsistent with other evidence in the record. Neither petitioner reported any income or expenses relating to the computer business.  Presumably phone costs could be expensed if they were incurred in a trade or business.  Moreover, petitioners have not introduced any evidence corroborating their testimony concerning the computer business.

Preparation of Mr. and Mrs. Paterson's Tax Returns

Both petitioners retained a tax preparer, Mr. Hughes, to prepare their returns for the years at issue.  Mr. Hughes had assisted petitioners with their returns for years and knew about Mr. Paterson's bookmaking activities.

Mrs. Paterson gave Mr. Hughes her Forms W-2, Wage and Tax Statement, from NWA but did not tell him about the large deposits into her separate bank accounts during the years at issue.  Mr. Paterson simply told Mr. Hughes how much income he had because Mr. Paterson kept no records.  Mr. Hughes prepared returns for Mr. Paterson using the amounts Mr. Paterson gave him even though Mr. Hughes knew Mr. Paterson was a bookmaker and dealt in cash.

Petitioners each filed tax returns for the years at issue as married filing separately.[5]  Mr. Paterson reported total income of $46,018 in 1997 and $48,481 in 1998.  Mrs. Paterson reported total income of $5,947 in 1997 and $1,511 in 1998.

Respondent's Examination

Respondent examined the married filing separate returns of both petitioners.  Neither petitioner cooperated with respondent during the audit, and respondent issued summonses to each of them. Both petitioners asserted their Fifth Amendment rights in response to the summonses and refused to answer any questions or produce any records to respondent.

---

[5]The record does not reflect the dates petitioners filed the tax returns.  We note that respondent did not determine that either petitioner was liable for the addition to tax under sec. 6651(a)(1) for failure to file timely returns for the years at issue.

Respondent's Determination of Petitioners' Income

Respondent's revenue agents determined petitioners' income. A different revenue agent was assigned to each petitioner. Respondent's revenue agent Ms. Johnson (Revenue Agent Johnson) was assigned to Mr. Paterson. Revenue Agent Johnson used the profit factor method to redetermine Mr. Paterson's income. Revenue Agent Johnson began by examining the 4 days of betting sheets seized in the December 1999 search. Revenue Agent Johnson added 10 percent vigorish, the amount charged on a losing bet, to the bets listed on the sheet that did not carry vigorish and then added all bets together to find the gross wagers. Revenue Agent Johnson then divided the total gross wagers she found, $384,282, by 4 days of betting to obtain the average daily bet of $96,070.50.

Revenue Agent Johnson then used the call records for the cellular phones to determine the number of days people called Mr. Paterson to place bets. Revenue Agent Johnson multiplied the $96,070.50 average daily bet by the number of days people placed bets for each year to arrive at the gross wagers for each year. Finally, Revenue Agent Johnson multiplied the gross wagers for each year by 4.54 percent. This percentage represented the profit a bookmaker would make if his or her books were balanced. Revenue Agent Johnson determined that Mr. Paterson had gross income of $357,651.26 in 1997, of which $305,151 Mr. Paterson failed to report. For 1998, Revenue Agent Johnson determined

that Mr. Paterson had gross income of $270,419.24, of which $215,019 Mr. Paterson failed to report.

Respondent's revenue agent Ms. Zamora (Revenue Agent Zamora) was responsible for handling the determination of Mrs. Paterson's income. Revenue Agent Zamora used the bank deposits method to reconstruct Mrs. Paterson's income. Revenue Agent Zamora used third-party procedures to obtain bank records and other documents. Revenue Agent Zamora added together all the taxable deposits into Mrs. Paterson's various separate bank accounts and subtracted the sources of income reported on the return. Revenue Agent Zamora determined that for 1997, Mrs. Paterson had taxable deposits of $170,579.41, of which $160,637.41 Mrs. Paterson failed to report. For 1998, Revenue Agent Zamora determined that Mrs. Paterson had taxable deposits of $63,343.42, of which $61,832.42 Mrs. Paterson failed to report.

Respondent issued deficiency notices to petitioners for 1997 and 1998. The deficiency notices to Mr. Paterson were dated April 1, 2004, with respect to 1997 and November 4, 2004, with respect to 1998. The deficiency notice to Mrs. Paterson covered both 1997 and 1998 and was dated April 1, 2004. Petitioners each timely filed petitions. The cases were consolidated for purposes of trial, briefing, and opinion.

## OPINION

We are asked to decide whether petitioners, a longtime bookmaker with a criminal history and his wife, failed to report income in the amounts respondent determined. We are also asked

to decide whether petitioners are liable for fraud penalties with regard to the unreported income. Finally, we are asked to decide whether the limitations period bars respondent from assessing petitioners' liabilities. We begin by discussing the unreported income.

## I.   Unreported Income

Gross income generally includes all income from whatever source derived. Sec. 61(a). Taxpayers must keep adequate books and records from which their correct tax liability can be determined. Sec. 6001. When a taxpayer fails to keep records, the Commissioner has discretion to reconstruct the taxpayer's income by any reasonable means. Sec. 446(b); Webb v. Commissioner, 394 F.2d 366, 372 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Factor v. Commissioner, 281 F.2d 100, 117 (9th Cir. 1960), affg. T.C. Memo. 1958-94. Where a taxpayer has destroyed his or her tax records, the Commissioner's reconstruction need not be arithmetically precise. DiMauro v. United States, 706 F.2d 882, 885 (8th Cir. 1983), affg. 81-2 USTC par. 16,373 (D. Neb. 1981).

### A.   Mr. Paterson's Unreported Income: Profit Factor Method

We first discuss respondent's use of the profit factor method to reconstruct Mr. Paterson's income. The Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving that these determinations are

erroneous.[6]  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Unreported income from wagering activities involves a special rule, however.  The Commissioner must first present some evidence connecting the taxpayer with a wagering activity during the years at issue to obtain the benefit of the presumption of correctness.  <u>DiMauro v. United States</u>, <u>supra</u> at 884; <u>De Cavalcante v. Commissioner</u>, 620 F.2d 23, 27-28 (3d Cir. 1980), affg. <u>Barrasso v. Commissioner</u>, T.C. Memo. 1978-432; <u>Pizzarello v. United States</u>, 408 F.2d 579, 583 (2d Cir. 1969).  Once the Commissioner has met this minimal evidentiary foundation, the burden then shifts to the taxpayer to prove the Commissioner's determination was incorrect.  <u>DiMauro v. United States</u>, <u>supra</u> at 884.

Mr. Paterson stipulated that he operated a professional bookmaking and wagering business during the years at issue.  Sufficient evidence therefore exists to connect Mr. Paterson with a wagering activity during the years at issue.  The burden is thus on petitioners to prove that respondent's determination was incorrect.

We have previously approved the profit factor method as a reasonable method to determine income from bookmaking activities.  <u>Robinson v. Commissioner</u>, T.C. Memo. 1986-382.  Revenue Agent Johnson applied the profit factor method as described in <u>Robinson</u>

---

[6]This principle is not affected by sec. 7491(a) because neither petitioner cooperated with respondent's reasonable requests during respondent's examinations.  See sec. 7491(a)(2)(B).  Accordingly, the burden of proof remains with petitioners.

to reconstruct Mr. Paterson's income using 4 days of wagering records seized in the search. The wagering records show an average daily bet of over $96,000, and the profit factor method suggests net income of approximately $350,000 and $270,000 for the respective years at issue, while Mr. Paterson reported gross income of only approximately $45,000 for each year at issue. This is a vast disparity. Petitioners make several arguments why the profit factor method is inappropriate and does not accurately reflect Mr. Paterson's income for the years at issue.

First, petitioners argue that Mr. Paterson's sons were involved in the gambling enterprise with him and should be allocated some of the income. Petitioners have introduced no evidence, however, regarding how the resulting income from the wagering activity was allocated between Mr. Paterson and his sons. Mr. Paterson's sons did not testify at the trial, nor was any evidence introduced to document what amount, if any, was attributable to the sons or reported on their returns. We conclude that petitioners have failed to prove that respondent erroneously allocated all of the gambling income to Mr. Paterson.

Second, petitioners argue that the small sample of 4 days of wagering cannot be extrapolated to reflect accurately Mr. Paterson's overall wagering activity for 2 years. Petitioners argue that the profit factor method is inappropriate because it is based on such a small sample of wagering activity, relying on Clayton v. Commissioner, 102 T.C. 632, 644 (1994). We held in Clayton that the profit factor method was inappropriate because

the calculation was based on a day of very active wagering on conference championship games.  Id.  We reject petitioners' argument.  The 4 days of seized wagering records are an accurate reflection of Mr. Paterson's wagering activity and can be used to redetermine Mr. Paterson's income for the years at issue.  None of the 4 days involved high profile conference championship games like those related to the day of wagering records in Clayton.  Moreover, the 4 days of wagering records did not include a Saturday, which is generally a high-volume day, but included a partial day of wagering as the search occurred before that day's wagering was complete.  These facts would actually tend to underestimate Mr. Paterson's income.  Simply underestimating the income does not make the method unreliable.

Third, petitioners argue that the 4 days of wagering records are inaccurate because some of the wagers were never consummated because of Mr. Paterson's arrest.  This fact is irrelevant.  Before the search, Mr. Paterson was engaged in his normal bookmaking activities and would have collected the wagers absent the search and his arrest.  Moreover, the unconsummated wagers and the raid occurred in 1999, not 1997 or 1998, the years at issue, where the bookmaking activities occurred without interruption.  We conclude the 4 days of wagering records are an accurate reflection of Mr. Paterson's wagering activity even if some wagers were never consummated.

Finally, petitioners argue that the profit factor method disregards Mr. Paterson's actual losses and that the 4.54-percent

theoretical profit unreasonably exaggerates Mr. Paterson's income.  We disagree.  Mr. Paterson has introduced no evidence of his actual profit margin or any evidence that would tend to show respondent's method was unreasonable or incorrect.  Moreover, the United States District Court for the District of Nebraska has found it reasonable to assume a bookmaker's profits will generally amount to 4.5 percent of total wagers in the excise tax context.  DiMauro v. United States, 81-2 USTC par. 16,373 (D. Neb. 1981).

In sum, we find Mr. Paterson had unreported income in the amounts respondent determined in the deficiency notices.  We conclude that the profit factor method respondent used to reconstruct Mr. Paterson's bookmaking income was reasonable and substantially accurate.  Petitioners have introduced no documentary evidence to show otherwise.  Any inaccuracies in the income reconstruction are attributable to Mr. Paterson's failure to maintain books and records and to his failure to cooperate with respondent during the audit.

B.    Mrs. Paterson's Unreported Income:  Bank Deposits Method

We next examine respondent's use of the bank deposits method to determine Mrs. Paterson's unreported income.  We have previously approved the use of the bank deposits method as a means of income reconstruction.  Clayton v. Commissioner, supra at 645; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  It is not arbitrary or capricious for the Commissioner to use the bank deposits method to compute the

income of a taxpayer who has kept no books and records and who has large bank deposits. Clayton v. Commissioner, supra at 645; DiLeo v. Commissioner, supra at 867. Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The bank deposits method assumes that all money deposited into a taxpayer's bank account during a particular period constitutes taxable income. Clayton v. Commissioner, supra at 645. The Commissioner must take into account, however, any known nontaxable source or deductible expense. Id.

We reiterate that the Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving that these determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. at 115. Respondent's agent used third-party procedures to obtain information about funds deposited into Mrs. Paterson's personal bank accounts and subtracted from these funds the amounts of income Mrs. Paterson reported on her returns for the years at issue. Mrs. Paterson reported a mere $5,947 in 1997 and $1,511 in 1998, while respondent determined she had unreported income from the cash deposits of $160,637.41 in 1997 and $61,832.42 in 1998. Petitioners make two primary arguments why respondent's determinations regarding Mrs. Paterson's unreported income are erroneous.

First, petitioners argue that the bank deposits method double counts income that Mr. Paterson reported on his returns. Petitioners have introduced no evidence to support this argument,

however.  Petitioners have failed to prove the portion of deposits in Mrs. Paterson's separate bank accounts that were attributable to Mr. Paterson's bookmaking activities.  Absent any documentary evidence, we decline to speculate as to the extent of any double counting of income.  Moreover, respondent's profit factor method used to determine Mr. Paterson's income may underestimate Mr. Paterson's income.  We note that one of the 4 days used in the method was just a partial day, and none of the days used in the method was a Saturday, a high-volume day.  Thus, any potential double counting of income may be offset by underestimating some of Mr. Paterson's income, and we shall not speculate further.

Second, petitioners argue that some of the deposits Mrs. Paterson made into her bank accounts during the years at issue are nontaxable or are loans.  Petitioners argue that these deposits include a $160,000 gain on the sale of stock, insurance reimbursement for stolen jewelry, a $50,000 loan, and $6,900 of gain on the sale of other stock.[7]  Petitioners have introduced no documentary evidence to support their claims and rely only on their uncorroborated, self-serving testimony, which we are not required to accept and which we do not find to be credible.  See

---

[7]Petitioners argue on brief that the amounts representing gain on the sale of stock are nontaxable.  We surmise that petitioners mean that the deposits in Mrs. Paterson's account are the proceeds of stock sales and she should be taxed only to the extent the proceeds exceed her basis.  There is no evidence that after the stock sales, cash was transferred from Mrs. Paterson's securities account into her bank account.  Instead, proceeds from securities transactions remained in the securities account to be reinvested.

Neidringhaus v. Commissioner, 99 T.C. 202, 219 (1992). In addition, petitioners argue that a good friend of Mrs. Paterson "loaned" her $50,000 because the memo notation on the check said "loan-taxes." Petitioners did not have the friend testify or produce any documentation regarding this "loan." The failure of a party to introduce evidence which, if true, would be favorable to that party gives rise to the presumption that the evidence would be unfavorable if produced. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Petitioners have not proven that any of these items are nontaxable deposits or are loans. Petitioners have also introduced no evidence to support that Mrs. Paterson is entitled to any additional expenses or losses.

In sum, we find that Mrs. Paterson had unreported income in the amounts respondent determined in the deficiency notice.

## II. Fraud Penalty

We next consider whether either petitioner is liable for the fraud penalty for the years at issue. The Commissioner must prove by clear and convincing evidence that the taxpayer underpaid his or her income tax and that some part of the underpayment was due to fraud. Sec. 6663(a); Clayton v. Commissioner, 102 T.C. at 646. If the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except to the extent the taxpayer establishes by a preponderance of the

evidence that a portion of the underpayment is not due to fraud. Sec. 6663(b); Smoll v. Commissioner, T.C. Memo. 2006-157.

Fraud is a factual question to be decided on the entire record and is never presumed. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Beaver v. Commissioner, 55 T.C. 85, 92 (1970). The Commissioner must show that the taxpayer acted with specific intent to evade taxes that the taxpayer knew or believed he or she owed by conduct intended to conceal, mislead, or otherwise prevent the collection of the tax. Sec. 7454; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Stephenson v. Commissioner, 79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Direct evidence of fraud is seldom available, and its existence may therefore be determined from the taxpayer's conduct and the surrounding circumstances. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Courts have developed several indicia or badges of fraud. These badges of fraud include understating income, maintaining inadequate records, concealing income or assets, failing to cooperate with tax authorities, engaging in illegal activities, filing false documents, and dealing in cash. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Although no single factor is necessarily sufficient to establish fraud, a combination of several of these factors may be persuasive evidence of fraud. Solomon v.

<u>Commissioner</u>, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

    A.    <u>Mr. Paterson's Liability for the Fraud Penalty</u>

We now consider whether Mr. Paterson is liable for the fraud penalty. We agree with respondent that several badges of fraud are present with respect to Mr. Paterson's underpayments of tax. Mr. Paterson earned his income through an illegal wagering enterprise. Mr. Paterson routinely destroyed his wagering records after each football game to avoid being held accountable for his illegal activities. He was arrested for his activities, was convicted of tax evasion, and pleaded guilty to filing false and fraudulent Forms 730. Mr. Paterson dealt in cash exclusively. He did not keep records of the cash he received from his customers and did not maintain a bank account that would allow tracking of his income. Mr. Paterson also concealed assets. He shielded his property by not taking title to assets, such as the home in which he resided with Mrs. Paterson and the Cadillac he drove. In addition, the primary asset of his wagering enterprise was the cellular phones, which were registered in his wife's name. Mr. Paterson provided incomplete and false information to his return preparer, simply telling his return preparer how much income to report instead of providing him documentation. Mr. Paterson also failed to report his golf or card game winnings on his returns. Finally, Mr. Paterson failed to cooperate with respondent during the audit.

We conclude that respondent has proven by clear and convincing evidence that Mr. Paterson fraudulently understated his tax liabilities for the years at issue, and Mr. Paterson has failed to show that any portion of the underpayments is not due to fraud.  We find that the fraud penalty under section 6663 applies to Mr. Paterson's underpayments of tax for the years at issue.

B.    Mrs. Paterson's Liability for the Fraud Penalty

We now consider whether Mrs. Paterson is liable for the fraud penalty.  We agree with respondent that many of the badges of fraud are present with respect to Mrs. Paterson's underpayments.  Mrs. Paterson was aware of her husband's illegal activities.  She facilitated the illegal activities by obtaining the cellular phones her husband used to accept bets.  She also received the benefit of these illegal activities by accepting and depositing cash or checks made out to her husband.  She concealed the source of these funds further by depositing them into her separate bank accounts, not the joint bank accounts that had only minimal activity.  She also kept title solely in her name to the Patersons' significant assets, such as their home and bank accounts and brokerage accounts with considerable funds.  Mrs. Paterson did not maintain adequate records and never told her tax preparer about the large sums she periodically deposited into her separate bank accounts.  Finally, Mrs. Paterson understated her income significantly on her tax returns and did not cooperate with respondent during the audit.

We conclude that respondent has proven by clear and convincing evidence that Mrs. Paterson fraudulently understated her tax liabilities for the years at issue and Mrs. Paterson has failed to prove that any portion of the underpayments is not due to fraud.  We find that the fraud penalty under section 6663 applies to Mrs. Paterson's underpayments of tax for the years at issue.

III. Limitations Period

Petitioners argue that the 3-year limitations period under section 6501(a) has expired and that respondent is therefore barred from assessing petitioners' taxes for the years at issue. Respondent issued deficiency notices to petitioners on April 1, 2004 (with respect to Mrs. Paterson's liability for both years and Mr. Paterson's liability for 1997) and November 4, 2004 (with respect to Mr. Paterson's liability for 1998).  The limitations period commences on the date the return is filed.  Sec. 6501(a). Returns filed before the due date are deemed filed on the due date.[8]  Sec. 6501(b).

In the case of false and fraudulent returns with the intent to evade tax, the tax may be assessed at any time.  Sec. 6501(c)(1).  Because we have found that petitioners are each liable for the fraud penalty under section 6663, we hold that the limitations period for assessing petitioners' taxes is extended

---

[8]Although the dates petitioners filed the returns are not evident from the record, the earliest the returns would be treated as filed is Apr. 15, 1998 and 1999, respectively.  Sec. 6501(b).

indefinitely.  See sec. 6501(c)(1); <u>Sam Kong Fashions, Inc. v.</u> <u>Commissioner</u>, T.C. Memo. 2005-157.  Accordingly, respondent is not barred from assessing petitioners' deficiencies.  See sec. 6501(c)(1).

Respondent would not be barred from assessing petitioners' taxes for the years at issue even if we had not found that petitioners had filed false and fraudulent returns.  The limitations period is extended to 6 years if a taxpayer omits from gross income an amount that is 25 percent of the amount the taxpayer stated in the return.  Sec. 6501(e)(1)(A).  Both petitioners omitted from gross income amounts vastly in excess of 25 percent of the amounts stated on the returns, and the limitations period would be extended to 6 years.  Respondent issued deficiency notices within 6 years of the due dates of the returns and is thus not barred from assessing petitioners' taxes.

We have considered all remaining arguments the parties made and, to the extent not addressed, we conclude they are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.